564 So.2d 671 (1990)
Richard and Nancy RAJNOWSKI
v.
ST. PATRICK'S HOSPITAL, et al.
No. 89-C-2786.
Supreme Court of Louisiana.
April 30, 1990.
Rehearing Denied May 24, 1990.
Lawrence Kullman, Lewis & Kullman, New Orleans, for applicant.
*672 Robert Clements, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, Charles Boudreaux, Sr., Pugh & Boudreaux, Lafayette, for respondent.
MARCUS, Justice.
Richard and Nancy Rajnowski, individually and on behalf of their minor child, Richard Rajnowski, Jr., filed suit against St. Patrick's Hospital and Dr. Floyd Guidry, seeking damages for their child's brain damage resulting from alleged negligent medical treatment during the prenatal period and delivery. Each defendant filed an exception of prescription, arguing that plaintiffs' cause of action had prescribed under La.R.S. 9:5628 because suit was filed more than three years after the birth of the child. The trial judge granted defendants' exceptions of prescription dismissing the suit with prejudice. Plaintiffs did not appeal the judgment granting St. Patrick's Hospital's exception of prescription; therefore, the judgment is definitive as to St. Patrick's Hospital. Plaintiffs appealed the judgment granting Dr. Guidry's exception of prescription. The court of appeal affirmed.[1] On plaintiffs' application, we granted certiorari to review the correctness of that decision.[2]
Upon the recommendation of a friend, Nancy Rajnowski made an appointment for an examination with Dr. Floyd Guidry, an obstetrician and gynecologist. Her first appointment was on August 30, 1982. After reviewing the results of a blood test, Dr. Guidry confirmed that Mrs. Rajnowski was approximately sixteen weeks pregnant. Dr. Guidry became Mrs. Rajnowski's regular obstetrician and treated her throughout the pregnancy. The doctor's clinical records of Mrs. Rajnowski's first examination indicate no abnormalities except that she was 5'2" and weighed 200 lbs. and had slightly elevated blood pressure.
Mrs. Rajnowski's pregnancy developed normally until December 31, 1982 when a standard office urine test revealed an elevated sugar level of 2+. To rule out other potential causes such as a renal condition, Dr. Guidry ordered further tests including a glucose tolerance test and a post prandial test. On January 3, 1983, the doctor received the results of the lab test which indicated that Mrs. Rajnowski had a fasting blood glucose level of 209 mg.% and 2+ ketones in her urine.[3] Dr. Guidry instructed his nurse to call Mrs. Rajnowski to give her the lab test results but the nurse was unable to reach her because the records contained an incorrect phone number. At the next regularly scheduled examination on January 14, 1983, the office urine test revealed a 2+ sugar level in the urine. Dr. Guidry diagnosed the condition as gestational diabetes, discussed it with Mrs. Rajnowski and placed her on an 1800 calorie per day diabetic diet. He informed her that, if untreated, gestational diabetes could cause the death of the fetus. He also told her that it would be necessary to induce labor early because there was a greater risk of death to the fetus if the pregnancy were allowed to continue for the full term of forty weeks. At this examination, the doctor ordered a second set of lab tests. The lab conducted these tests but invalidated the results because Mrs. Rajnowski had not fasted as required prior to taking the test.[4] Dr. Guidry decided to allow time for the diet to control the diabetic condition and did not order Mrs. Rajnowski to repeat the lab tests.
At the next two regular examinations, the office urine tests showed lower levels of sugar in the urine. On January 21, 1983 the sugar level was 1 + and on January 23, 1983 the sugar level was negative. Dr. Guidry interpreted these results to mean that the diet was working to control the gestational diabetes. He believed there was no need to test for ketones at these examinations because, when the urine sugar *673 level is 2+ or lower, there is only a trace or a negative level of ketones in the urine. On January 31, 1983, the urine test revealed a 1+ sugar level. Mrs. Rajnowski complained of some decreased fetal movement; however, the doctor stated that this was not an uncommon complaint toward the end of pregnancy. Because the sugar level was slightly elevated, fetal movement had decreased and the pregnancy was in the thirty-eighth week, Dr. Guidry scheduled induction of labor for the following day, February 1, 1983. Although a subsequent urinalysis after the delivery did reveal some ketones, Dr. Guidry explained that this result was consistent with starvation during labor and delivery.
On the morning of February 1, 1983, Mrs. Rajnowski was admitted to St. Patrick's Hospital and induction of labor began. At approximately 12:30 p.m. Dr. Guidry decided to perform a caesarean section because the fetal monitor showed some distress, and the labor was not progressing naturally. The doctor discussed these findings with Mrs. Rajnowski and obtained her consent to the procedure. Prior to the procedure, Mrs. Rajnowski had been given epidural anesthesia which eliminates pain but allows the patient to remain alert and to move the lower body. Upon delivery, Dr. Guidry found that the umbilical cord had a true knot and was wrapped around the infant's neck four times. Immediately after delivery, the infant was in a depressed state with no heart rate. The apgar score at one minute was 2 of a possible score of 10. The infant responded well to resuscitation which included an external cardiac massage, oxygen and intubation. The apgar score at five minutes was 7, indicating a significant improvement. The infant was male and weighed 6 lbs. and 5 ozs. There was no evidence that the infant had brain damage at delivery or during hospitalization. The infant did not immediately suffer complications normally associated with brain damage such as seizures, renal failure or congestive heart failure. He was initially placed in intensive care and remained hospitalized until February 16, 1983.
The infant developed normally until October 1983 when he had a seizure at eight and one half months of age. Dr. Kim, the infant's pediatrician, believed that the seizure was due to high fever. The seizures continued periodically. In July 1984, Dr. William Bell, a pediatric neurologist, examined the child. He inquired about the prenatal period and delivery as well as other medical history. He found that there were indications of epilepsy and developmental delay, but concluded that the seizures were idiopathic or of unknown origin. In early 1985, Mr. and Mrs. Rajnowski viewed a television program concerning the connection between DPT injections[5] and seizures. They consulted an attorney, Mr. Peter Pulaski, in June or July of 1985. When Mr. Pulaski failed to obtain the medical records of the pregnancy and delivery as he had agreed to do, Mr. Rajnowski obtained them in July or August of 1985. The child was then examined by Dr. Robert Summers, a pediatric neurologist, in July, 1985. Dr. Summers inquired about the complete medical background including pregnancy and delivery. On August 2, 1985, Dr. Summers informed Mr. and Mrs. Rajnowski that the child had brain damage in the right temporal lobe. He stated that the damage could have occurred at any time, including during pregnancy or delivery. A few months later, Mr. Pulaski informed Mr. and Mrs. Rajnowski that they did not have a cause of action based on the DPT injections. They subsequently contacted a second attorney, Mr. Lou Pignatelli, in the summer of 1986. A request for review of their claim was filed with the Commissioner of Insurance under La.R.S. 40:1299.47(A)(2)(a) on August 1, 1986. Suit was subsequently filed on September 29, 1986.
Plaintiffs contend that their cause of action has not prescribed because Dr. Guidry's failure to disclose material information triggered the application of the doctrine of contra non valentem, interrupting the prescriptive period. They argue that Dr. Guidry failed to disclose material information *674 on the condition of Mrs. Rajnowski during pregnancy and that this prevented them from availing themselves of their cause of action. Dr. Guidry contends that plaintiffs' cause of action has prescribed under La.R.S. 9:5628 because suit was filed more than three years after the birth of the child and because his conduct did not rise to the level of concealment, misrepresentation, fraud or ill practices necessary to trigger application of the doctrine of contra non valentem.
The central issue in this case is whether Dr. Guidry's conduct constitutes concealment, misrepresentation, fraud or ill practices that prevented plaintiffs from availing themselves of their cause of action triggering the application of the doctrine of contra non valentem.
The time for filing medical malpractice actions is set forth in La.R.S. 9:5628. The statute provides:
No action for damages for injury or death against any physician, chiropractor, dentist, psychologist, or hospital duly licensed under the laws of this state, whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of such discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect. (Emphasis added).
Contra non valentem is a judicially created exception to the general rule of prescription and is based on the civilian doctrine of contra non valentem agere nulla currit praescripto.[6] The doctrine applies in four general situations:
(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
(2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action;
(4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.
Whitnell v. Menville, 540 So.2d 304, 308 (La.1989).
This court held that the legislature by enacting La.R.S. 9:5628 has in a limited manner legislatively overruled the fourth exception of the judicially created doctrine of contra non valentem as it applies to medical malpractice actions filed more than three years after the date of the act, omission or neglect. Chaney v. State Through Dept. of Health and Human Resources, 432 So.2d 256, 259 (La.1983). See also Whitnell, 540 So.2d at 309. This court has recently addressed the applicability of the third category of contra non valentem, that is, whether the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action, to medical malpractice actions. In Gover v. Bridges, 497 So.2d 1364 (La. 1986), this court held that the defendant's misstatements did not constitute fraud, concealment, misrepresentation or a breach of a duty to disclose, and did not prevent plaintiffs from learning of the cause of action and filing suit. In Whitnell, 540 So.2d at 310, the court found that defendant's alleged negligent misdiagnosis was not sufficient to trigger application of the doctrine, but remanded to allow amendment of the petition because plaintiffs had raised a colorable argument that defendant breached his duty to disclose material information. The court stated, but did not decide, that a breach of a duty to disclose material information regarding a patient's *675 physical condition might fall within the third category of contra non valentem.
Plaintiffs' expert, Dr. Michael Hughey, evaluated the medical records of the pregnancy and delivery,[7] and concluded that Mrs. Rajnowski had ketoacidosis[8] during the last month of her pregnancy. He based his finding on the lab test results showing 2+ and moderate ketone levels in the urine on January 3 and January 17, 1983, respectively. He stated that ketoacidosis could have caused hypoxic brain damage to the fetus by reducing uterine blood flow and diminishing the oxygen content of the fetal blood. He concluded that Dr. Guidry should have hospitalized Mrs. Rajnowski and started insulin treatment at that time. Dr. Guidry maintains that the medical evidence indicated only gestational diabetes and not ketoacidosis. Dr. Guidry's experts, Dr. Peter LaFuria and Dr. Elias Chalhub, evaluated the records and concluded that the evidence at delivery gave Dr. Guidry no reason to doubt his original diagnosis or to believe that the diabetes was out of control during the last month of the pregnancy.
Dr. Guidry informed Mrs. Rajnowski that she had gestational diabetes and that uncontrolled diabetes could lead to the death of the fetus. After Mrs. Rajnowski began following the prescribed diet, office urine tests indicated that her urine sugar level was decreasing gradually. On January 14, 1983, there was 2+ sugar in the urine. On January 21, 1983, there was 1 + sugar in the urine. On January 28, 1983, there was a negative sugar level in the urine. These results indicated that the diet was working to control the gestational diabetes. Dr. Guidry believed there was no need to continue testing for ketones because a 2+ or lower level of sugar in the urine indicates trace or negative levels of ketones in the urine. At delivery, the amniotic fluid was clear, and showed no signs of meconium staining that would usually indicate severe fetal distress during pregnancy or at birth. After clinical examination, the placenta and umbilical cord showed no evidence of any abnormalities that could be expected in uncontrolled diabetes. Further, at birth, the infant showed no signs indicative of a case of severe uncontrolled diabetes or ketoacidosis in the mother. The infant did not have significant congenital abnormalities such as macronomia, an extremely large body. There were no signs of acute asphyxia, renal failure, congestive heart failure or seizures during the newborn period. The infant did have some conditions that would have been found in any child whose mother had gestational diabetes. Based on this evidence, Dr. Guidry did not believe that the gestational diabetes was out of control or had developed into ketoacidosis during pregnancy. Moreover, he thoroughly discussed all of his findings during the pregnancy and after delivery with Mrs. Rajnowski. He informed her of all of the medical evidence that he considered material. Under the circumstances, we conclude that Dr. Guidry's nondisclosure of the test results showing some ketones in the urine did not constitute concealment of material information.
Plaintiffs also contend that Mrs. Rajnowski had hypertension throughout her pregnancy and that Dr. Guidry should have informed her of this condition. Dr. Guidry informed Mrs. Rajnowski that her blood pressure was elevated on several occasions. He attributed the slight elevation in blood pressure to Mrs. Rajnowski's weight. He thought that medication was not warranted because it could have reduced the blood flow to the fetus. Throughout her pregnancy, plaintiff's diastolic *676 blood pressure was below the borderline of 100. Moreover, there was no evidence of hypertensive changes in the placenta. Because Mrs. Rajnowski's blood pressure was never dangerously elevated and did not vary significantly during the pregnancy, Dr. Guidry did not believe it was necessary to further inform her of this condition. We agree that Dr. Guidry did not withhold any material information regarding this condition.
Moreover, Dr. Guidry did not prevent plaintiffs from learning of or availing themselves of their cause of action. Plaintiffs were aware of sufficient information to incite their inquiry. They became aware that the child had a seizure disorder when seizures began occurring approximately eight and one half months after the birth of the child. Plaintiffs were also aware that the diabetic condition and complications during delivery were potentially very serious and could have caused the fetus' death. Dr. Guidry's conduct did not preclude plaintiffs from acquiring the medical records of the pregnancy and birth. The records were available at all times, yet plaintiffs did not request them until over two years after the birth of the child.
In conclusion, we find that Dr. Guidry discussed all of his material findings with plaintiffs, and did not withhold any material information. Clearly, his conduct did not rise to the level of concealment, misrepresentation, fraud or ill practices necessary to trigger application of the doctrine of contra non valentem. Moreover, Dr. Guidry's conduct did not prevent plaintiffs' discovery or timely filing of their suit. Accordingly, plaintiffs' cause of action prescribed under La.R.S. 9:5628 because suit was filed more than three years after the date of the alleged act of negligence and there was no interruption of prescription.

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed.
DENNIS, J., concurs with reasons.
CALOGERO, C.J., and SHORTESS and LEMMON, JJ., dissent and assign reasons.
DENNIS, Justice, concurring.
I respectfully concur.
Although the majority opinion clearly implies it, I believe that the court should take this opportunity to expressly declare that contra non valentem applies to interrupt prescription under R.S. 9:5628 when the defendant has intentionally, fraudulently or through ill practice prevented the plaintiff's timely action. As Justice Provosty observed in Hyman v. Hibernia Bank & Trust Co., 139 La. 411, 418, 71 So. 598, 600 (1916):
A defendant, who has kept a plaintiff in close confinement during the prescriptive period so as to preclude his bringing suit, could certainly not be allowed to invoke prescription against plaintiff's suit, and thereby reap the fruit of his own wrong. And between incapacitating a plaintiff and confining his body and incapacitating him by fraudulently lulling his mind into a false security and keeping him in ignorance there is no difference in principle.... It is equally a wrong of which the perpetrator cannot be allowed to reap the benefit.
In my opinion, it is inconceivable that the legislature could have intended to overrule this ancient principle, and the majority opinion implicitly acknowledges as much.
SHORTESS, Justice,[*] dissenting.
The operative facts are not in dispute. Tests run by Dr. Guidry during the latter stages of Nancy Rajnowski's pregnancy showed ketones in her urine, suggestive of a progressive diabetic condition known as ketoacidosis, which, if not treated promptly, can cause serious problems to a mother and can also cause hypoxic brain damage to the unborn child. Dr. Guidry apparently felt it was gestational diabetes rather than ketoacidosis. Regardless, he did not tell plaintiffs how serious Mrs. Rajnowski's *677 condition was, nor did he institute insulin treatment, preferring to treat with diet.
In my opinion these are material facts which the doctor knew and plaintiffs did not.
After delivery, the plaintiffs were told that the baby's umbilical cord had been wrapped around his neck, so I don't think plaintiffs were unreasonable in believing that their baby's early problems were associated with the cord.
Regardless of how one describes Dr. Guidry's omission, i.e., negligence, concealment, misrepresentation, or fraud, the bottom line is that plaintiffs did not know how serious the problem could be, and they were given a plausible alternative reason at the time of delivery for the baby's problems. The third category of contra non valentum should apply here to interrupt prescription. It provides: "the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action...."
I respectfully dissent.
CALOGERO, Chief Justice, dissenting.
I am not convinced from the evidence presented at the hearing on the exception of prescription that the doctor did not deliberately conceal from these plaintiffs information concerning the elevated ketone levels and diabetic ketoacidosis; nor that there was not a substantial possibility that those conditions, uncorrected (indicative of a very serious diabetic condition), caused the child's brain damage at or shortly after birth.
I would, in this opinion, address and resolve the question of whether the third category of contra non valentemwhere the debtor has done some act effectively to prevent the creditor from availing himself of his cause of actionbars application of the three year medical malpractice prescription period. I believe that Harvey v. Davis, 432 So.2d 1203 (La.App. 4th Cir. 1983), correctly determined that contra non is applicable in such a situation.
I would reverse the court of appeal's sustaining of the exception at this juncture. The parties might then fully try the lawsuit on the merits, with the defendant at the conclusion of trial at liberty to except anew on prescription, and to counter the plaintiff's argument on the evidence regarding medical negligence. Our review on appeal would then better permit us to answer or address an additional question raised by defendant, i.e., whether negligent or inadvertent failure to disclose material information, not just intentional concealment, activates the third or "prevention" category of contra non valentem.

ON APPLICATION FOR REHEARING
DENNIS, Justice, concurring in denial of rehearing.
The plaintiffs take issue with the plurality's statement to the effect that the physician disclosed all material facts to the patient. They contend that the presence of ketones in the patient's urine was a material fact the non-disclosure of which prevented the plaintiffs' timely commencement of this action. In my opinion, however, even if the presence of ketones was material and the failure to disclose that fact caused the plaintiffs' tardiness, the doctrine of contra non valentem may not be invoked because the physician did not intentionally conceal that fact from the plaintiffs.
The statute to be interpreted here is La. R.S. 9:5628, which in pertinent part provides:
No action for damages for injury or death against any physician ... whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought unless filed within one year from the date of the alleged act, omission, or neglect, or within one year from the date of discovery of the alleged act, omission, or neglect; however, even as to claims filed within one year from the date of discovery, in all events such claims shall be filed at the latest within a period of three years from the date of the alleged act, omission, or neglect.
La.R.S. 9:5628(A)
The statutory language evokes questions as to its proper interpretation. Does a *678 physician's intentional concealment or non-disclosure of facts that would apprise a patient that he has a cause of action toll the running of prescription? Does the negligent act or omission by a doctor that prevents discovery of a cause of action interrupt prescription? I think that the legislature did not intend to abrogate the jurisprudential rules providing for the tolling of prescription because of a physician's intentional non-disclosure or concealment of facts that would have given a patient notice of malpractice. On the other hand, I believe the legislature intended that the express provisions of the statute shall govern when the doctor's act or omission which prevented discovery of the cause of action was merely negligence or innocent misrepresentation.
In order to properly interpret the statute it is important to recall some of the basic principles of statutory interpretation. A statute is valid as an expression of the will of the legislature, formulated in writing, and binding on everyone because of the authors' constitutional power. La.Const. art. 3 § 1(A); La.C.C. art. 2; F. Gény, Methode d'Interprétation et Sources en Droit Privé Positif No. 93 (2d ed. La.St.L. Inst. trans. 1963). However, a statute is not necessarily a perfect and complete revelation of positive law which should be considered a priori as self-sufficient and cast in a mathematically exact form. It may contain ambiguities or, if read literally, lead to absurd consequences. La.C.C. art. 9. Consequently, it may not be interpreted with the conviction that by purely logical and therefore mechanical procedure it is possible to extract from it with assurance all the solutions to the questions presented by legal practice. F. Gény, supra, No. 96. On the other hand, the interpreter is not entitled to neglect or devalue the legislator's intention in the name of basing his interpretation directly on the conscience of the people as the ultimate source of the positive rules of law. Id. Nos. 97, 98.
Hence, to interpret a statute is simply to look for the content of the legislative will with the help of the formula in which it is expressed. Id. No. 98. In doubtful cases, the law must be interpreted as having the meaning that best conforms to the purpose of the law. La.C.C. art. 10. The interpretation of a legislative text strongly resembles the interpretation of a private legal document, especially a formal notarized act the content of which is expressed in an authentic formula that clearly outlines its contours. F. Gény, supra, No. 98; see La.C.C. arts. 9-11, 2045-2050.
The revelation of the legislative intent must be sought primarily in the textual formula. As soon as the intent is derived from the text and is not controlled by any extraneous element, it dictates the interpreter's decision and eliminates any doubts. F. Gény, supra, No. 101. But interpretation of written law would be reduced to too narrow a field of application if it were to limit itself exclusively to the formulation of the text and never to step out of the limits of its strictly intrinsic elements. Id. No. 103. A statute is not only an intellectual phenomenon; it is also and inseparably a social phenomenon. Its intellectual substance is enveloped by the social climate which determines its precise contours. Hence, it is often necessary to take into account certain elements extraneous of the text but in intimate contact with it. Id.; La.C.C. art. 12.
These extraneous elements are of varied nature. To understand the practical scope of the statute the interpreter must reconstruct as exactly as possible the fact situation the legislator intended to regulate, and all the circumstances which determined it and which come from the ethical, political, social, economical and even technical exigencies the statute was supposed to satisfy. The interpreter also has available for consideration the social and legal environment out of which the statute came forth and which is determined by the historical precedents, the exact motive for the enactment, and the conceptions predominant in the mind of the authors, as well as more indirect but equally effective influences such as foreign legislation. F. Gény, supra, No. 103. Then comes the legislative record, as a formal element which amplifies and sometimes explains the text. And *679 there can be present also a purely logical element which can consist either of certain principles considered objectively true and endowed with an absolute value, that can be assumed to have dominated the thought of the drafters of the statute or of comparison with various other statutes which clarify or complete the statute under interpretation. Id. This last element is especially important in the case of codifications, the very nature of which offers an opportunity for broad logical elaboration based on the necessary harmony between their provisions materially as well as chronologically interdependent and forming an integral part of the same whole. Id. No. 102; see, e.g., Kellis v. Farber, 523 So.2d 843, 846 (La.1988). These elements and others that can be legitimately added may properly be employed to extract the secret of the statutory text or to better penetrate its meaning. They should be taken into account, however, only to the extent they are evidence of subjective impressions affecting the authors of the statute. F. Gény, supra, No. 103.
Common law authorities have developed similar methods of statutory interpretation relying on extratextual sources. One commentator has stated that consideration of context is required in order to determine true legislative intent, because a communication consists of both the vehicle of communication and the context within which that vehicle operates, and "[n]o communication is complete without both." R. Dickerson, The Interpretation and Application of Statutes 103 (1975). He defines the context of a law as "related statutes and case law and the coordinate fund of shared habits, knowledge, values, and purposes external to that statute." Id. at 110. The "almost indispensable" function of context is to narrow the potential meaning of overbroad words. Id. at 111.
This court often uses extratextual sources in interpreting legislation. Particularly relevant in the present case is our adaptation of the common law approach of narrowly interpreting statutes that are in derogation of common rights. See, e.g., G.I. Joe, Inc. v. Chevron U.S.A., 561 So.2d 62 (La.1990); Keelen v. State, 463 So.2d 1287 (La.1985); Louisiana Nat. Bank v. Triple R Contractors, 345 So.2d 7 (La. 1977); Lamar Life Ins. Co. v. Babin, 246 La. 19, 163 So.2d 81 (1964); Charles Tolmas, Inc. v. Police Jury, 231 La. 1, 90 So.2d 65 (1956); Cendon v. H.G. Hill Stores, 171 La. 341, 131 So. 41 (1930); City of Crowley v. Duson, 147 La. 520, 85 So. 226 (1920). While this doctrine has often been used by common law courts to limit the legislature's power to modify judge-made rules of law, we have used it by analogy to preserve harmony between the general principles found in our constitution and civil code and the exceptions to those general principles often embodied in special statutes. As used in our cases, this principle reflects a policy that rules of general applicability should be applied to all cases except when the contrary is specifically and expressly commanded by the legislature. Special laws that seek to confer extraordinary benefits or liabilities on specific classes of persons are disfavored, because it is presumed that the legislature always bears in mind its obligation to treat similarly situated persons in a similar manner. In determining what the legislature has commanded, "the legitimate content of the statute, to be derived by interpretation, [is] only what its authors intended and in fact expressed in their injunction." F. Gény, supra, No. 98. This is also related to the presumption that the legislature is aware of the general law and intends its enactments to complement that law. La.C.C. art. 13; Kellis v. Farber, 523 So.2d at 846.
In the present case a number of factors must be taken into account to reconstruct the fact situation the legislature intended to regulate. Of primary importance are the historical development of the doctrine of contra non valentem and the discovery rule, the impact of the discovery rule on malpractice litigation, and the ethical, social and legal environment out of which the statute came forth, including dominant principles such as the fiduciary relationship between physician and patient, the physician's duty to disclose material information to his patient, and the patient's right to *680 determine what shall or shall not be done with his or her body.
The most direct legal context of the statute relates to the law of prescription in malpractice actions at the time of the enactment of the statute. Since as early as Reynolds v. Batson, 11 La.Ann. 729 (1856) this court has applied the equitable doctrine that no prescription runs against one unable to bring an action, embodied in the maxim contra non valentem agere nullit currit praescriptio. Reynolds v. Batson recognized three instances in which the doctrine applied:
1st. Where there was some cause which prevented the courts or their officers from acting or taking cognizance of the plaintiff's action; ....
2d. ... [W]here there was some condition or matter coupled with the contract or connected with the proceeding which prevented the creditor from suing or action.....
3d. ... [W]here the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action.
11 La.Ann. at 730.
After the adoption of La.R.S. 9:5628, in Corsey v. State Dep't of Corrections, 375 So.2d 1319 (La.1979), we recognized a fourth more modern situation, "[w]here the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant." 375 So.2d at 1322. Despite the explicit statutory admonition currently expressed in La.C.C. art. 3467, the courts have developed and applied contra non valentem as a means of doing justice in particular cases where a literal application of the statutory law would result in manifest injustice. See J. Cueto-Rua, Judicial Methods of Interpretation of the Law 69 (1981). These value judgments have been recognized and deemed still relevant by the drafters of the new code articles on prescription. La.C.C. art. 3467 comment (d).
Despite the fact that contra non valentem was a doctrine of general applicability to the law of liberative prescription, its application to medical malpractice cases was recognized in only two cases prior to 1975, Perrin v. Rodriguez, 153 So. 555 (La.App.Orl.1934) and Steel v. Aetna Life & Cas., 304 So.2d 861 (La.App.3rd Cir. 1974), writ denied, 315 So.2d 144 (1975). In 1975, however, the legislature was approached by doctors and their malpractice insurers, who complained of a "medical malpractice crisis." One of the perceived problems facing malpractice insurers was the use in other states of the so-called "discovery rule," under which prescription did not begin to run until discovery of the injury. Comment, Recent Medical Malpractice LegislationA First Checkup, 50 Tul. L.Rev. 655, 672-73 (1976). This rule, which is similar to the fourth category of contra non valentem that we recognized in the Corsey case in 1979, created a potential "long tail" on claims in which the injury did not manifest itself until years after the act of malpractice. See Crier v. Whitecloud, 496 So.2d 305, 309 n. 5 (La.1986) (on rehearing); Comment, supra, at 673.
Another issue facing the legislature was this court's action in Steel v. Aetna Life & Cas., supra. In addition to their contra non valentem theory, the plaintiffs in that case argued that because the physician and patient had a contract for medical care, a malpractice action was governed by the contractual prescriptive period of ten years rather than the one-year period applicable to delictual obligations. In March of 1975, approximately one month before the April opening of the legislative session, this Court denied writs, stating, "On the facts found, the result is correct." Two justices who concurred in the denial on the facts, however, indicated that the ten year period should apply, and stated:
We suggest that if the legislature intends that physicians who cause personal injury through negligent acts in the performance of their medical contracts with patients should have a different prescription applied to them, it should so provide. If it fails to do so this Court should return to the proper interpretation of the law as it is now written.
315 So.2d 144 (La.1975)
(Barham and Tate, JJ., *681 concurring in writ denial).
The 1975 legislature thus faced on the one hand the possible application of the ten-year contractual prescriptive period to malpractice claims, and on the other the potential importation of a discovery rule that could extend such periods for twenty years or more, depending on the circumstances. At the same time, doctors and their insurers were entreating the legislature with stories of a malpractice crisis that, according to them, threatened to disrupt the delivery of health care services in this state.
In addition to malpractice prescription law, the legislature also considered the statute against the backdrop of the legal aspects of the physician-patient relationship. In law the prevailing view is that the relationship between a physician and patient is a fiduciary one that creates a duty in the doctor to disclose to his patient any material information concerning the patient's physical condition. See, e.g., State ex rel. Woytus v. Ryan, 776 S.W.2d 389 (Mo.1989); Black v. Littlejohn, 312 N.C. 626, 325 S.E.2d 469 (1985); Liebergesell v. Evans, 93 Wash.2d 881, 613 P.2d 1170 (1980). The legislature itself has implicitly recognized the fiduciary nature of the relationship by prohibiting certain donations by the patient to the physician. See La.C.C. art. 1489. Consequently, the practically universal rule has long been that a deliberate act of deception by a physician to conceal from a potential plaintiff that he has a cause of action, thereby inducing him to postpone institution of a suit, will be held to toll the statute of limitations. See, e.g., Burton v. Tibble, 189 Ark. 58, 70 S.W.2d 503 (1934); Schmucking v. Mayo, 183 Minn. 37, 235 N.W. 633 (1931); Tortorello v. Reinfeld, 6 N.J. 58, 77 A.2d 240 (1950); Shearin v. Lloyd, 246 N.C. 363, 98 S.E.2d 508 (1957); Hinkle v. Hargens, 76 S.D. 520, 81 N.W.2d 888 (1957); Carrell v. Denton, 138 Tex. 145, 157 S.W.2d 878 (1942); cf. 1 D. Louisell & H. Williams, Medical Malpractice ¶ 13.11 (1990). Some courts have held that this duty to disclose stems from the patient's right to determine what shall and shall not be done with her body. Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 105 N.E. 92 (1914); Nixdorf v. Hicken, 612 P.2d 348 (Utah 1980); Gates v. Jensen, 92 Wash.2d 246, 595 P.2d 919 (1979).
Article 1, section 5 of the 1974 Louisiana Constitution expressly guarantees that every person shall be secure in his person against unreasonable "invasions of privacy". This safeguard establishes an affirmative right to privacy impacting non-criminal areas of law, including a patient's right to decide whether to obtain or reject medical treatment and what shall or shall not be done with his body. Hondroulis v. Schuhmacher, 553 So.2d 398, 414-415 (La.1988). The United States Supreme Court has recently stated that a competent person has a liberty interest protected by the fourteenth amendment in choosing to refuse unwanted medical treatment. Cruzan v. Director, Missouri Dep't of Health, ___ U.S. ___, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Several other states have similarly held that the right to choose or reject medical treatment is both a federal and state constitutionally protected right. See Rasmussen by Mitchell v. Fleming, 154 Ariz. 207, 741 P.2d 674 (1987); Bouvia v. Superior Court, 179 Cal.App.3d 1127, 225 Cal.Rptr. 297 (1986); In re Guardianship of Barry, 445 So.2d 365 (Fla.App.1984); In re Quinlan, 70 N.J. 10, 355 A.2d 647, cert. denied, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); In re Colyer, 99 Wash.2d 114, 660 P.2d 738 (1983).
Finally, the legislature was faced with the ethical standards of the medical profession, and the physician's ethical obligation to his patient. Acting for the good of the patient is the most ancient and universally acknowledged principle in medical ethics. E. Pellegrino & D. Thomasma, For the Patient's Good 73 (1988). Every participant in clinical ethical decisions invokes the good of the patient to justify his or her moral choice. Id. at viii. The two major ethical theories vying for dominance in promoting the good of the patient are the autonomy of the individual patient and the social utility and accountability of the physician. Id. at 3. All professional medical codes are built on systems of obligations *682 related to the special role of a physician in society and stress his ideals of service, compassion, promise-keeping, truth telling, confidentiality and a patient's autonomy. Id. at 121. For several decades the general trend in medical ethics and law has been toward greater recognition of a physician's fiduciary obligation to fully disclose to a patient information regarding the condition of the patient's body. LeBlang & King, Tort Liability for Nondisclosure: The Physician's Legal Obligations to Disclose Patient Illness and Injury, 89 Dickinson L.Rev. 1, 2 (1984). The ethical basis for many state laws and court decisions recognizing a physician's legal duty to disclose can be traced to Bills of Rights for patients and residents of hospitals and nursing facilities. See, e.g., American Hospital Association Bill of Rights (1973); Department of Health, Education and Welfare Bill of Rights, 39 Fed.Reg. 35, 774-5 (1974); cf. LeBlang and King, supra, at 2.
These legal and ethical principles are so well known and firmly established that legislators must have been aware of them when considering the bill that became La. R.S. 9:5628. Legislative action contradicting these principles would undermine physicians' ancient ethical and moral principles and be inconsistent with prevailing law and our own state constitution's declaration of rights. Such legislation would also be inconsistent with the legislature's refusal to include intentional acts within the definition of "tort" or "malpractice" in affording protection for allegedly negligent physicians under the Medical Malpractice Act. La.R.S. 40:1299.41(A)(7) & (8).
Considering these political, economic and social circumstances, I think that an appropriate interpretation of the statute should limit its effect to the fact situation the legislature intended to regulate without doing violence to principles of absolute value that can be assumed to dominate the thoughts of the drafters. Specifically, the statute should be read to prevent the application of the ten year prescriptive period applicable to contracts, leave intact our traditional rules of tolling or contra non valentem with respect to cases in which the doctor concealed or intentionally failed to disclose facts which would have given a patient notice of malpractice, and impose the discovery rule and the three year overall limitation in cases in which the prevention of discovery of the plaintiff's cause of action resulted from the doctor's mere negligence or innocent misrepresentation. There is nothing in the statutory formula or the extraneous elements to suggest that the legislature intended to exempt any case of ordinary negligence from the three year overall limitation. In fact, such an interpretation might create an exception encompassing so large a percentage of malpractice situations as to swallow the statutory rule. Since the plaintiffs here claim that the nondisclosure was occasioned only by the defendant doctor's negligence in failing to properly ascertain the patient's condition himself, the court correctly held the claim precribed and rehearing is properly denied.
NOTES
[1] 551 So.2d 806 (La.App. 3d Cir.1989).
[2] 556 So.2d 1252 (La.1990).
[3] A ketone is an organic acid which when found in excessive amounts in the body are an indication of uncontrolled diabetes. Black's Medical Dictionary 501 (32nd ed. 1979).
[4] The actual results of this test indicated a fasting blood glucose level of 263 mg.% and a moderate level of ketones in the urine.
[5] A DPT injection is a vaccination against diphtheria, pertussis and tetanus.
[6] Prescription does not run against a party unable to act. Crier v. Whitecloud, 496 So.2d 305, 307 n. 4 (La.1986).
[7] The parties entered a stipulation in which they agreed to allow the trial court to consider several medical reports written by the parties' experts.
[8] Ketoacidosis is a condition in which excessive amounts of ketones accumulate in the blood and urine. Symptoms include changes in sensorium, deep respiration, fruity acetone odor on the breath, nausea and vomiting, abdominal tenderness, extreme thirst and dry mucous membranes, weight loss, and diabetic history in most patients. Treatment of ketoacidosis includes correction of five abnormalities: hyperglycemia, acidosis, low blood volume, hyperosmolality, and potassium loss. Merck Manual, 1073, 1080-81 (15th ed. 1987).
[*] Judge Melvin A. Shortess of the First Circuit Court of Appeal participated in this decision as Associate Justice Pro Tempore.