| ]AMY, Judge.
The plaintiff plantation owners filed suit against a neighboring farm and a chemical company alleging that a herbicide applied to an adjacent field migrated onto their property, damaging several oak trees. The defendants ’ filed exceptions of prescription asserting that the plaintiffs filed suit more than one year after they had sufficient knowledge that any damage to their property was caused by the herbicide application. Although originally referred to the merits,' the trial court granted a subsequently filed exception on this basis. The plaintiffs now appeal. For the following reasons, we affirm.
Factual and Procedural Background
Louis J. Cornay and his wife, Jeanne Williams Cornay, are the owners of Chretien Point, a plantation home near Sunset, Louisiana. In the petition instituting this matter, the Cornays alleged that a neighboring farmer, Berchman Lavergne, sprayed a herbicide on his soybean crop growing in a field directly across the road |2from their property. The plaintiffs alleged that these sprayings, which allegedly occurred in 1988 and 1989, utilized Command Herbicide, a herbicide manufactured by FMC Corporation (FMC).
The plaintiffs asserted in their petition that this application was negligently performed on a windy day causing a drift of the herbicide. According to the plaintiffs’ original petition, Lavergne’s negligent application of the herbicide ultimately “caused the death of one live oak tree and damage to eight other live oaks, a water oak, and a Southern magnolia.” Both Lav-ergne and FMC were named as defendants in the petition filed May 29, 1992. The plaintiffs sought recovery for property damage as well as mental anguish.
After the initial petition was filed, both defendants filed exceptions of prescription asserting that suit was filed in excess of one year after any cause of action stemming from the 1988 and 1989 applications arose. The record indicates that the original judge hearing the case referred the exceptions to the trial on the merits of the suit.
In June 1996, the plaintiffs filed a supplemental and amending petition alleging that “FMC Corporation through its agent, Mr. Henry Stefanski, assured Mr. Cornay on more than one occasion that Command could in no way cause the damages he claimed were done to his property.” Furthermore, the plaintiffs alleged that the herbicide was defective and presented an unreasonable risk of harm.
Thereafter, both defendants once again filed exceptions of prescription. Each was alternatively styled as a motion for summary judgment. In extensive reasons for ruling, the trial judge, different from the judge who referred the original exceptions lato the merits, found that additional evidence submitted by the parties indicated that prescription began to run on April 25, 1991. As suit was not filed until May 29, 1992, he maintained both of the defendants’ exceptions.
The plaintiffs appeal, asserting the following assignments of error:
1. The trial court committed manifest error in upholding defendants’ Exception of Prescription and should have upheld Judge Joseph LaHaye’s judgment referring the exception to the trial on the merits.
2. The trial court erred in apparently not considering the evidence presented in Mr. Jim Foret’s deposition.
3. The trial court erred in failing to apply the doctrine of contra non valen-tem with regard to its application of LSA-C.C. Article 3492; and,
4. The trial court erred in not applying C.C. Article 3493.
Discussion
Previous Ruling
In their first assignment of error, the plaintiffs argue that the trial court erred in maintaining the exceptions of pre *947 scription after they had been referred to the merits by the original trial judge. They contend that the subsequent exceptions were based upon the same evidence relied upon in the original exceptions.
In written reasons for ruling, the trial court found, in part, as follows with regard to the previous ruling of the original judge:
On September 3, 1993, Judge Joseph LaHaye, the writer’s predecessor to the Division B bench, considered defendants’ exception of prescription. Having considered both the arguments of counsel and the evidence, Judge LaHaye referred the exception to the merits. Defendants now re-urge their motion for the exception of prescription. A hearing was had on this re-urged exception on February 6,1998.
14While this Court gives great deference to its predecessor’s decisions, there has been more evidence adduced in this matter. The Court must now consider the following additional evidence. Specifically, the Court must consider defendants’ exhibits “Cornay F 1-7.”
Despite the parties’ styling of Judge La-Haye’s ruling upon the original exceptions of prescription, the record does not'indicate that Judge LaHaye denied the exceptions, only that they were referred to the merits of the trial. The exceptions, which had not been ruled upon, were merely reurged by the parties. Furthermore, as is evident from the trial court’s rulings, new evidence was presented and relied upon. We find no error in the trial court’s decision in this regard.
Prescription
The plaintiffs’ remaining assignments all relate to the appropriateness of the trial court’s maintenance of the exceptions of prescription. As such, we will address these assignments together. Principally, the plaintiffs contend that the court’s judgment was erroneous as the doctrine of contra non valentem is applicable and should have been found to suspend the prescriptive period until June-July of 1991, the time at which they had an arborist inspect their trees and advise that the damage was associated with chemical exposure. They contend that contra non valentum became operative due to statements from an FMC representative indicating that Command did not cause the type of damage of which they complained.
La.Civ.Code art. 3492 provides that “[djelictual actions are subject to a libera-tive prescription of one year. This prescription commences to run from the day | .¡injury or damage is sustained.” Furthermore, with regard to damage to immov-ables, as is alleged in the instant matter,[1] Article 3493 provides:
When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage.
(Emphasis added.)
In the instant matter, the plaintiffs’ petition alleges that the harmful spraying of the FMC herbicide by Lavergne was performed in 1988 or 1989. The original petition instituting this matter was filed on February 29, 1992. Thus, the face of the petition indicates the cause of action has prescribed, a situation requiring the plaintiff to bear the burden of demonstrating that the claim has not prescribed. See Williams v. Sewerage & Water Bd. of New Orleans, 611 So.2d 1383 (La.1993); Taussig v. Leithead, 96-960 (La.App. 3 Cir. 2/19/97); 689 So.2d 680.
*948 In the.instant matter, the plaintiffs attempt to meet their burden by urging that prescription was suspended due to the doctrine of contra non valentem. This doctrine prevents the running of prescription “where the cause of action is not known or reasonably knowable by the plaintiff.” Cole v. Celotex Corp., 620 So.2d 1154, 1156 (La.1993). As explained by the Louisiana Supreme Court in Wimberly v. Gatch, 93-2361 (La.4/11/94); 635 So.2d 206, the doctrine of contra non valentem is contrary to the express provisions found in the Louisiana Civil Code. However, “the | ^principles of equity and justice which form the mainstay of the doctrine ... demand' that under certain circumstances, prescription be suspended because plaintiff was effectually prevented from enforcing his rights for reasons external to his own will.” Id. at p. 8; 211.
In Rajnowski v. St. Patrick’s Hosp., 564 So.2d 671, 674 (La.1990), the supreme court explained that the doctrine of contra non valentem applies in the following four circumstances:
(1) where there was some legal cause which prevented the court or their officers from taking cognizance of or acting on the plaintiffs action;
(2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action;
(4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.
See also Wimberly, 93-2361; 635 So.2d 206. The plaintiffs’ arguments stem from the third and fourth categories.
In opposition to the exceptions of prescription, the plaintiffs relied upon information obtained from Jim Foret, an arborist who inspected the plaintiffs’ trees in June—July 1991. A letter from Foret following his inspection provides, in part, as follows:
[ 7Pear Mr. Cornay:
On June 27, 1991 and July 3, 1991 I visited your Chretian Point property to appraise damages to trees in front of the old home. The damages resulting from herbicide applications in a nearby soybean field.
My inspection revealed extensive small limb and twig damage to live Oaks. A large Live Oak was killed. A Water Oak and Southern Magnolia were also damaged.
I predict that the growth lost due to herbicides will take several years to replace. I estimate your loss to be $70,-720.
In their brief to this court, the plaintiffs claim that, due to Foret’s findings from this inspection, they “finally had enough evidence to institute suit for their damages and filed a petition for same on.May 29, 1992, which was quite timely.”
As the trial court’s reasons for ruling reveal a finding that the cause of action arose at an earlier date, we turn to a review of the parties’ full submission to the trial court. We begin with the deposition testimony of Mr. Cornay for a chronological overview of the pertinent chain of events. Mr. Cornay’s deposition testimony indicates that he knew in 1988 and 1989 that Command had been used. He stated that he began to notice changes in vegetation on his property, became concerned, wanted to know what had been used, and went to the Lavergne’s “loading area” across the road from Chretien Point. In that area, he found “pamphlets and empty cans or empty containers of the product called Command.” Mr. Cornay stated that he retrieved the pamphlet which included a phone number for concerns about the product. Mr. Cornay further confirmed that he contacted the Department of Agriculture for an investigation of any potential problem.
*949 |sThe evidence in the record indicates that Merrill Dupre responded as an inspector for the Department of Agriculture. His summary of the investigation was filed into the report of this 1989 inspection and reveals the following:
Mr. Louis Cornay called in his complaint. I met with him June 8, 1989. He told me that when the farmer across the road from his place had sprayed his soybean field that whatever he used had drifted on his trees, grass, rose bushes, shrubs and herb garden and the leaves had turned white. He told me that the same thing happened last year.
In my inspection of the grounds I found symptoms of chemical injury to most of the plants and that the leaves and grass were white. The damage seems to be slight.
I contacted Mr. Berchman Lavergne, the farmer who did the spraying on his bean field and he told me that he had applied Canopy and Command to his bean field. I plan to make more inspections in the future.
Further, the record indicates that Mr. Cornay made another complaint in 1989, a complaint to FMC.
A Fieldman’s Report was completed by FMC Sales Representative Henry Stefan-ski. This report, which was completed following a June 12, 1989 investigation indicates that Stefanski and FMC Service Manager Tom Crumby visited Chretien Point after a complaint by Mr. Cornay. A handwritten report completed by Stefanski indicates that the home’s lawn had been bleached following a 1988 spraying and that the yard and a few trees had once again been bleached following the 1989 spraying. Stefanski also reported that Mr. Cornay was concerned for his pregnant daughter and grandchild who had been on the lawn prior to the bleaching and that he asked Stefanski to calculate his damages for replanting an herb garden as well as for his daughter’s mental anguish due to any exposure. Stefanski reported that he could | gforesee no damages unless the herb garden needed to be replaced and further suggested that a letter be sent to Mr. Cornay “showing his daughter has nothing to worry about, and wait & see what he will do.”
The record also contains a letter from FMC dated June 9, 1989 and addressed to Mr. Cornay which reveals, in part, as follows:
Dear Mr. Cornay:
Thank you for your call to FMC Corporation discussing your concern regarding the possible, unintentional -exposure of your vegetation to Command Herbicide. We hope that the points listed below will answer any questions you may have on health, safety or the impact of the product on your vegetable gardens, ornamental shrubs or trees.
Command Herbicide is registered with the Environmental Protection Agency, having endured the Agency’s meticulous and thorough registration process. In order to gain registration under federal law, Command was extensively tested to determine its effect on human health, wildlife and the environment. These tests demonstrated that the active chemical in Command:
• Does not cause cancer, birth defects or reproductive [ejffects.
• Is relatively non-toxic even when large quantities are swallowed, inhaled or absorbed through the skin.
• Is rapidly eliminated from the body and does not accumulate in tissues.
• Is not an irritant to the eyes or skin.
• Has no short or long term adverse effects on wildlife.
[[Image here]]
As with almost any crop protection product, there is the possibility of unintentional exposure. Generally, this would be on adjacent foliage and is more noticeable with Command than with other herbicides because of the yellowing or whitening that takes place.
*950 ImCurrent data demonstrate that such contact with leaves only impacts the plant temporarily and produces no permanent effect. As such, ornamental trees and shrubs are not permanently affected by inadvertent exposure to Command. Affected foliage may retain symptoms that decrease in severity with time. New growth is unaffected. Inadvertent exposure of home gardens of Command Herbicide may lead to concerns about eating fruits and vegetables. FMC has conducted studies where edible crops were directly sprayed to simulate unintentional exposure. These studies demonstrated that no residues of Command were detectable in or on the edible portions of such crops as tomatoes at The normal time of harvest. Therefore, we are not aware of any danger involved in eating fruits and vegetables which show no discoloration, even if non-edible leaves on the same plant may. We recommend, however, that you not eat home-grown vegetables (leaf lettuce, greens, etc.) whose edible portions show discoloration suspected of being attributable to use of Command Herbicide.
Mr. Cornay’s deposition indicates that following this initial series of inquiries in 1989, one of his oak trees fell in January 1990 and that the condition of others deteriorated. ■ Prior to April 1991, Mr. Cornay consulted with Bob Thibodeaux, an arborist who treated the damaged trees and who, at some point, indicated that there could be some correlation between the tree damage and chemical exposure. The record demonstrates that, at this time, the Department of Agriculture was once again contacted regarding problems at Chretien Point. Merrill Dupre once again inspected the area and completed a report on April 19,1991 which provides as follows:
Mr. Louis Cornay sent a letter to Dr. Fred Whitford requesting that I go look at his oak trees which were damaged in 1988 and 1989 by a drift of Canopy and Command, which are two herbicides used on soybeans.
I contacted Mr. Cornay 4/17/91. He showed me .the tree that had fallen down the previous year and the other oak tree that was affected.
In my inspection of this tree, I saw that the tree has shed almost all of its leaves and seems to be dying and in very bad shape.
|nI am unable to tell what caused the tree to do this at this time, but I did make an inspection in 1989 and had. found symptoms of chemical injury to these trees then. The symptoms were the leaves were turning white and also the grass and other shrubs on the grounds surrounding Mr. Cornay’s house were turning white.
I advised Mr. Cornay that maybe he could contact the FMC Corporation and they could tell him if it is the Command that is killing his trees or something else that is causing this.
After the completion of Dupre’s report, the record indicates that Mr. Cornay once again contacted FMC on April 24, 1991. Mr. Cornay testified that he contacted FMC again because his inquiry into his problem was complete and he wanted to know if FMC could provide any further information. He stated that • he really didn’t know what was causing his current problems, but that Command had been a chemical that had affected his property at one time. After this contact, Stefanski once again completed a Fieldman’s Report which was entered into the record and contains, in part, as follows:
Mr. Cornay called me 4-24-91, he said I should come out to his historic plantation home (Cretain [sic] Point) and observe some of his 250 year old oak trees that were dying.
In 1988 (no complaint filed) and in 1989 (complaint filed) command drifted onto.the property of Mr. Cornay. In June of 1989 Tom Crumby & myself went to Cretain [sic] Point and observed reported damage. There was bleaching *951 of the grass under some of the trees as well as some leaves in azaleas and some sensitive species as tallow trees. No visible bleaching was noticed on the oak trees at that time.
Now 2 years later, Mr. Cornay has called and says his oak trees (2 or 3) valued at 65-$95,000 are dying and the only chemical that they have been exposed to was Command.
He had a arborist (Ted [sic] Thibo-deaux) from Church Point look at the trees. He did not blame Command directly but may be pointing the finger our way.
hJ explained to Ms. Cornay that many things can kill trees and command does not exhibit those kinds of happenings.
Mr. Cornay testified that all of these pieces of information came together like ingredients in a cake. He stated that “when you — when you’re making a cake, you put one thing into the bowl, you put another thing into the bowl, another thing into the bowl, you stir it up, put it in the oven, and then you have a cake.” He stated that all of this information came together into a “cake” in June 1991 when he “considered all of the information that [he] had been gathering, and that was my conclusion then.” In June of 1991, at the time Mr. Cornay asserts he began to make the connection between the herbicide and the damaged trees, Foret was consulted. As explained above, Foret’s report indicated that the trees were damaged due to chemical exposure. It is from this point that Mr. Cornay asserts that prescription began to run.
In synthesizing the above-related information, the trial court found, in part, as follows:
“Cornay F 1-7” are the FMC field notes from June, 1989 and April, 1991. In the June, 1989 field notes, the field-man, Mr. Stefanski, noted that Mr. Cor-nay was concerned with Command’s impact on his family’s health, his lawn and his herb garden. Contrast with Mr. Stefanski’s field notes of April 27, 1991. On the date of that investigation, Mr. Cornay told Mr. Stefanski that his oak trees were dying and the only chemical they have been exposed to was Command. Mr. Cornay related that an ar-borist had already examined the trees. While Mr. Cornay did not say Command was the cause of the damage, it was implied. If this evidence were uncontro-verted, this would certainly indicate that on April 25,1991, Mr. Cornay’s attention was excited.[2]
|isln connection with these FMC field-notes, we must also consider the newly introduced deposition testimony of Mr. Cornay concerning same. This deposition was taken on May 9, 1997. In his deposition, Mr. Cornay denies that these were his observations to Mr. Stefanski on April 25, 1991. Mr. Cornay states that on that day he was merely making an “inquiry’ of Mr. Stefanski concerning the dead/dying oaks and their possible connection to Command. [ ] When defense counsel asked Mr. Cornay when he got out of the inquiry mode,” Mr. Cornay likened his cognition to making a cake. Even though he had all of the ingredients to make the cake in April, 1991, the cake didn’t come together until June, 1991. When asked what “event” brought the ingredients together, Mr. Cornay responded “Nothing in particular, it was just that I — I considered all of the information that I had been gathering, and that was my conclusion then.” [ ] In essence, he had no new informa *952 tion after the FMC/Stefanski visit; it just made sense to him in June, 1991.
[[Image here]]
When did the Cornay’s know that they had a cause of action against FMC? Jordan v. Employee Transfer Corp., 509 So.2d 420, 424, provides guidance on this issue. In Jordan, the plaintiffs purchased a home without a faulty foundation. The realtor assured them that the cracks in the foundation were cosmetic. When the den flooded, the plaintiffs were confident that the foundation was not faulty based on the realtor’s assurance. However, when the den flooded a second time and the plaintiffs could see water seeping through the foundation, they had a “reasonable basis” to file a suit. Hence, prescription began to run when the den flooded a second time.
Mr. Cornay simply did not have enough information prior to 1991 to bring this cause of action. When in 1991 did the Cornay’s [sic] have a “reasonable basis” to bring this lawsuit? Mr. Cornay’s deposition revelation that no new information was gleaned between April 25, 1991 and June, 1991 (when Mr. Cornay claims that he knew he had a cause of action); combined with the previous evidence that on April 19, 1991, the La. Dept, of Agriculture suggested that FMC be contacted concerning the damage; indicates that Mr. Cor-nay had a “reasonable basis” to bring the suit in April, 1991. The prescriptive period in this cause of action began to run on April 25, 1991. When considering the totality of the circumstances, this court finds that the Cornay’s cause of action had prescribed by April 25, 1992. In accordance with this [14Court’s finding, defendants’ exception of prescription is sustained and this matter is hereby dismissed.
We find no manifest error in the trial court’s determination that the prescriptive period began to run in April 1991. While the plaintiffs urge this court to conclude that the record supports only a finding that the cause of action accrued when Mr. Cornay was privy to Foret’s June-July 1991 findings, we disagree. Our review of the above-related evidence demonstrates that, at the latest, Mr. Cornay had information providing evidence of sufficient notice of chemical exposure in April 1991. In Jordan, 509 So.2d at 423, the Louisiana Supreme Court stated that “[w]hen prescription begins to run depends on the reasonableness of a plaintiffs action or inaction.” Our review of the record certainly indicates that Foret’s investigation revealing chemical exposure was similar to information to which Mr. Cornay had been previously alerted. For example, even after Stefanski made statements which allegedly “lulled” the plaintiffs into a feeling that Command was not related to any property damage, Mr. Cor-nay continued his efforts with the Department of Agriculture and again contacted FMC. Evidence also exists indicating Mr. Cornay privately consulted an arborist, Bob Thibodeaux, who believed chemicals were related. “The rule that prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring suit, applies only when such ignorance is not wilful and does not result from negligence....” Id. at 428 (quoting Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285 (La.1970))(emphasis removed). Applying this maxim to the facts referenced above, we find no manifest |1serror in the trial court’s maintenance of the exceptions in favor of both Lavergne and FMC.
With regard to the plaintiffs’ assertion that any cause of action was suspended by FMC’s statements assuring him that the herbicide did not cause such problems, we find this argument meritless as well. Mr. Cornay has produced no evidence indicating that FMC’s assurances were misrepresentations or concealed any information indicating that the herbicide could cause the type of damage at issue. Further, it appears that even if these statements were misrepresentations, which we *953 do not find they were, the plaintiffs had sufficient outside information which would have also given notice that there could be some problem with the herbicide application.
Finally, we turn to the plaintiffs’ contention that the trial court failed to consider the deposition testimony of horticulturist Jim Foret. As previously stated, a letter from Foret, which was entered into evidence, indicates that he visited the property in June-July 1991 and determined there was chemical damage. He further testified as to this conclusion in his deposition. The plaintiffs contend that his confirmation was necessary for the plaintiffs to realize there was a cause of action.
We have reviewed Foret’s deposition testimony and find no need for the trial court to have referenced the deposition in the reasons for ruling. As previously stated, the testimony indicates he found that the trees had been damaged due to chemical exposure. However, we find nothing novel in this information, but rather, find it to be similar to that previously available to the plaintiffs. In fact, a portion of the deposition provides support for the position that Mr. Cornay was aware that use |1fiof the herbicide could have played a role in the resulting damage. The following colloquy is found in the deposition:
Q. Okay, let me ask you a couple of questions here. Do you feel you possess the expertise to say under oath that, more probably than not, the damage you saw was caused by a particular herbicide as opposed to some herbicide.
A. No. I can’t identify the herbicide damage specifically.
Q. Fair enough. You were unable to say and will not be expressing the opinion, then, that the damage you saw was or was not caused by Command?
A. That’s right. I was told that.
Q. By whom?
A. I think it was Mr. Cornay when he called me. I made a note of it in my field notes; so, I remember we spoke.
Therefore, we find nothing in the deposition indicating error in the trial court’s determination that prescription began to run before Foret’s visit. We find no merit in this argument.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assigned to the plaintiffs, Louis J. Cornay and Jeanne Adele Williams Cornay.
AFFIRMED.
WOODARD, J., CONCURS WITH REASONS.

. The trees allegedly damaged by the defendants are classified as immovables. La.Civ. Code art. 462 provides as follows: "Tracts of land, with their component parts, are immov-ables.” Further, Article 463 explains that "[b]uildings, other constructions permanently attached to the ground, standing timber, and unharvested crops or ungathered fruits of trees, are component parts of a tract of land when they belong to the owner of the ground.”

. Earlier in the reasons for ruling, the trial court referenced a line of Louisiana jurisprudence referring to notice sufficient to begin the running of prescription as that which is sufficient "to ‘excite attention and put (the) injured party on guard and call for inquiry.' Ledet v. Miller, 459 So.2d 202 (La.App. 3rd Cir.1984), writ denied 463 So.2d 603 (1985).” See also LeCompte v. State-Dep’t of Health and Human Resources, 97-1878 (La.App. 1 Cir. 9/25/98); 723 So.2d 474.