625 So.2d 548 (1993)
Christopher V. FONTAINE
v.
The ROMAN CATHOLIC CHURCH OF the ARCHDIOCESE OF NEW ORLEANS, et al.
No. 92-CA-2736.
Court of Appeal of Louisiana, Fourth Circuit.
September 30, 1993.
*550 David R. Paddison, Covington, Darryl J. Tschirn, Metairie, and Mack E. Barham, Robert E. Arceneaux, Gail N. Wise, Barham & Arceneaux, New Orleans, for plaintiff/appellant.
Don M. Richard, Denechaud & Denechaud, New Orleans, for The Roman Catholic Church of the Archdiocese of New Orleans and The Congregation of St. Rita Roman Catholic Church.
Gregg L. Sypridon, Lawrence J. Centola, Jr., Hoffman, Sutterfield, Ensenat & Bankston, New Orleans, for Intern. Ins. Co.
C. Wm. Bradley, Jr., Dwight C. Paulsen, III, Lemle & Kelleher, New Orleans, for U.S. Fidelity & Guar. Co.
Lindsay A. Larson, III, O'Neill, Eichen, Miller & Breckinridge, New Orleans, for Twin City Fire Ins. Co.
Arthur A. Lemann, III, and Edwin Stoutz, Jr., New Orleans, for Dino Cinel.
Before WARD, PLOTKIN and WALTZER, JJ.
PLOTKIN, Judge.
Plaintiff Christopher V. Fontaine appeals two trial court judgments.[1] First, he seeks reversal of a September 1, 1992 judgment granting an exception of prescription on his claims for sexual abuse and clergy malpractice against defendants Dino Cinel, St. Rita's Church of New Orleans, the Roman Catholic Church of the Archdiocese of New Orleans, Twin City Fire Insurance Company, United States Fidelity & Guaranty Company, and International Insurance Company. Second, he seeks reversal of a September 18, 1992 judgment granting a motion for summary judgment, dismissing from the suit defendants the Roman Catholic Church, Twin City Fire Insurance, United States Fidelity, and International Insurance. For the reasons discussed below, we affirm the trial court judgment granting the exception of prescription on the sexual abuse and clergy malpractice claims, but partially reverse the judgment granting the motion for summary judgment in favor of the church defendants.
Facts
Fontaine's suit is based on occurrences growing out of his relationship with defendant Cinel, a former Catholic priest, which relationship allegedly began in February of 1982, when Fontaine was 17 years old, and continued until late 1985 or early 1986. In his original petition, Fontaine claims that during that period Cinel "performed illicit acts upon the petitioner" which "caused petitioner to suffer severe physical and mental damage," damage which was "worsened" because it continued for a prolonged period of time. Additionally, Fontaine claims that he was defamed and that his privacy was invaded when Cinel marketed videotapes and photographs of him for publication.
During the relevant time period, Cinel served as a priest at St. Rita Church, which is under the auspices of the Roman Catholic *551 Church of the Archdiocese of New Orleans. Fontaine named both the church and the archdiocese defendants in his suit, claiming, among other things, that the church defendants provided Cinel with the "instrumentalities to conduct said illicit activity" and that the church defendants knew or should have known of the activities and taken "appropriate measures" to correct the situation. In his fifth supplemental and amended petition, Fontaine also claims that the archdiocese is liable for clergy malpractice for its negligence in "screening, hiring, training and supervis[ing]" Cinel. Various insurance companies were also named as defendants.
Fontaine's suit was filed on November 30, 1989; it has been construed to allege three separate causes of action(1) sexual abuse, (2) clergy malpractice, and (3) invasion of privacy. Because Cinel's relationship with Fontaine terminated in late 1985 or early 1986, the defendants filed exceptions of prescription, which were granted as to all defendants on both the sexual abuse and clergy malpractice claims. The trial court found that the invasion of privacy claim was not prescribed because Fontaine only discovered that cause of action when he saw a Dutch magazine devoted entirely to photographs of him in August of 1989, within one year of the date the suit was filed.
Since the granting of the exception of prescription left only the invasion of privacy claim, the church defendants and their insurers then filed a motion for summary judgment, claiming that Cinel's decision to submit the photographs for publication was completely divorced from any relationship Cinel had with the church. Finding that none of Fontaine's claims against the church defendants had merit after the defeat of the sexual abuse and clergy malpractice claims, the trial court granted the motion for summary judgment, dismissing the church defendants from the suit. Fontaine's only remaining claim is the cause of action for invasion of privacy against Cinel individually.
1. Exception of Prescription
Generally, Louisiana jurisprudence requires that courts strictly construe prescriptive statutes against finding that the case has prescribed and in favor of maintaining the cause of action. Bustamento v. Tucker, 607 So.2d 532, 537 (La.1992). Therefore, when a case is subject to two possible constructions, the court should adopt that construction which favors maintaining, rather than barring, the action. Id. See also Lima v. Schmidt, 595 So.2d 624, 629 (La.1992) (collecting cases).
In brief, Fontaine asserts four arguments for reversal of the exception of prescription: (1) that his claim is quasi-contractual and thus subject to a ten-year prescriptive period; (2) that his claim is not prescribed because he did not "discover" the abuse and malpractice until less than one year prior to the filing of suit; (3) that contra non valentem non currit praescriptio should apply to suspend prescription; and (4) that the judgment must be reversed because the granting of the exception violated established procedural requirements. Even in light of the above principles, we find no merit in any of Fontaine's arguments, for the reasons discussed below.
a. Quasi-contract
First, Fontaine argues that his claim for sexual abuse had not prescribed when he filed suit on November 30, 1989, even though his relationship with Cinel ended in late 1985 or early 1986, because his claim is actually based on a cause of action for breach of fiduciary duty sounding in quasi-contract, not tort, and thus is subject to a ten-year prescriptive period under La.C.C. art. 3499, rather than the one-year prescriptive period applicable to torts.
Fontaine's argument on this issue, which is apparently raised for the first time on appeal, is somewhat resourceful. He claims that at some point during his relationship with Cinel, Fontaine was brought before a Jefferson Parish judge for sentencing on a simple burglary charge. At that point, Fontaine says, Cinel intervened in the proceedings, convincing the judge to place Fontaine on probation and making one of the conditions of that probation that Fontaine perform community service at St. Rita's Catholic Church. Fontaine maintains that Cinel's actions resulted in a quasi-contractual relationship *552 between Cinel and the authorities; Fontaine claims that he was the intended beneficiary of that contractual relationship. Additionally, Fontaine argues that the contract resulted in a fiduciary relationship, which Cinel breached, entitling him to recovery for the damages caused by that alleged breach.
Although Fontaine's argument is resourceful, it is insufficient to overcome the exception of prescription because Fontaine failed to make any reference either to a cause of action in quasi-contract or to the facts which he claims resulted in the quasi-contract in either his original petition or any of his five supplemental and amending petitions. Under the jurisprudence of this state, the prescriptive period applicable to a case is determined by "the character of [the] action disclosed in the pleadings." Starns v. Emmons, 538 So.2d 275, 277 (La.1989). Since Fontaine's pleadings, even if construed liberally, fail to raise any issues which might be interpreted to sound a claim in quasi-contract, the trial court properly granted the exception of prescription.
In brief, Fontaine seeks to avoid this result by citing Roberson v. Provident House, 576 So.2d 992 (La.1991), for the proposition that "a Louisiana plaintiff is entitled to recover under any theory supported by the facts regardless of whether that specific legal theory is pled and even if not recognized until on appeal." However, even a superficial reading of Roberson reveals the error of Fontaine's interpretation. The principles stated in that case apply to situations where the pleadings have been enlarged to include new theories of the case by evidence admitted at trial without objection, not to cases involving exceptions of prescription.
b. Discovery rule
Generally, the "discovery rule" provides that prescription does not run against a plaintiff unless he "knew or reasonably should have known that he or she has suffered harm due to a tortious act of the defendant." Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La.1992). Fontaine claims that his sexual abuse claim against Cinel had not prescribed under this rule on November 30, 1989, because Fontaine did not become aware that Cinel's "entire course of conduct," specifically the "continuous, cumulative, and synergistic nature" of the conduct, constituted "sexual abuse" until he saw the photographs of himself published in a Dutch magazine in August of 1989. Fontaine says that "[o]nly the shock of the pictures sold for public consumption made Fontaine realize his betrayal at the hands of Cinel."
Fontaine cites the recent Louisiana Supreme Court case of Bustamento, 607 So.2d 532, in support of this argument. In Bustamento, the court found the defendant co-worker's actions in repeatedly subjecting the plaintiff to sexual harassment in the workplace constituted a "continuous tort," which did not prescribe until one year after the last act of sexual harassment occurred. In reaching that conclusion, the court distinguished between a "continuous tort," which occurs when "the cumulation of acts and conduct, and the resulting cumulation of damages, ... transforms the individual incidents... into an actionable tort," and, what we will call a "non-continuous tort," which occurs when "separate and distinct acts, each of which [give] rise to immediately apparent damages, result[] in the accrual of a separate cause of action when they occurred." Id. at 540.
We find this distinction helpful in assessing the claims of the plaintiff in this case. Certainly, the "sexual abuse" suffered by Fontaine resulted in immediately apparent damages at the time it occurred between February of 1982 and late 1985 or early 1986. Fontaine's damages allegedly suffered as a result of the sexual abuse itself were not dependent on "the cumulation of events," including the discovery of the pictures, to transform it into an actionable tort. Thus, this case is readily distinguishable from Bustamento on that issue.
Additionally, Fontaine's argument that he was unaware that he had suffered sexual abuse until he saw the pictures in the Dutch magazine defies logic. Fontaine would have this court believe that he only became aware of the sexual abuse when he discovered that Cinel had further "betrayed" him by selling the photographs. However, we can see no *553 connection between the two events which would justify an extension of the prescriptive period on the sexual abuse claim. Therefore, we reject Fontaine's argument on this issue.
c. Contra non valentum
Contra non valentem agere mulla currit praescripto, which means "prescription does not run against a party unable to act," is a judicially-created exception to the occasionally harsh prescription rules. Rajnowski v. St. Patrick's Hospital, 564 So.2d 671, 674 (La.1990). Generally, it provides that prescription should be extended under the following circumstances:
1. Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
2. Where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
3. Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and
4. Where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.
Id.
In the instant case, Fontaine argues that the third and fourth categories of contra non valentem should have been applied to this case. The major thrust of Fontaine's argument is that Cinel exerted such control over him that he "was prevented ... from availing himself of his cause of action." That alleged "control" resulted, Fontaine says, from a combination of Cinel's role as a Catholic priest, Fontaine's indoctrination concerning the regard to be afforded priests, and Cinel's intervention into Fontaine's criminal case. The fact that he was under Cinel's control, coupled with the "fact" of his mental retardation, which he specifically alleged in his fourth supplemental and amending petition, made him "unable to act," Fontaine claims.
In support of this argument, Fontaine cites a recent decision construing contra non valentem in a sexual abuse case, Held v. State Farm Insurance Co., 610 So.2d 1017 (La. App. 1st Cir.1992), writs denied 613 So.2d 975 (La.1993). In Held, the court applied the doctrine to suspend prescription against a 21-year-old daughter who filed suit against her father for sexual molestation during her minority. The court found that the daughter's post-traumatic stress syndrome, coupled with her parents' refusal to pay for her therapy and college expenses, rendered her "unable to act" for purposes of the doctrine.
The Held case is inapposite here for one primary reasonthe plaintiff in this case does not even allege that Cinel took any action to prevent him from filing suit once their relationship terminated in late 1985 or early 1986. Fontaine makes no allegations of financial or even psychological control after that time. Additionally, the plaintiff in this case does not claim to be suffering from post-traumatic stress syndrome. The only real common denominator between this case and the Held case is Fontaine's claim that he was unable to properly assess responsibility for the relationship until just prior to filing suit. This allegation is insufficient to invoke the doctrine of contra non valentem.
d. Procedural violations
Fontaine's final argument on the prescription issue is that the trial court improperly granted the exception because the defendants allegedly failed to carry their burden of proving that the claim had prescribed through the introduction of legally-competent evidence. Fontaine claims that the decision granting the exception of prescription was not subject to an evidentiary hearing, but was based on the consideration of materials attached to memorandums, which were not properly admitted into the record. Fontaine admits that no objection to consideration of the evidence was made at the trial court level.
The dissenting judge accepts this argument and votes to reverse and remand the entire case on the basis of the finding that no hearing on the prescription issue was conducted by the trial judge. The dissenting *554 judge would also reverse the granting of the motion for summary judgment on the same basis, although the appellant did not make that argument in brief. However, we refuse to reverse the judgment on the basis of Fontaine's procedural argument for the reasons discussed below.
First, the burden of proving that a petition has prescribed generally falls on the party bringing the exception, unless the petition is prescribed on its face, in which case the plaintiff bears the burden of proving that the petition has not prescribed. Martin v. Mid-South Tank Utilities Co., 614 So.2d 319, 321 (La.App. 4th Cir.), writ denied 616 So.2d 707 (La.1993). In this case, the plaintiff failed to list any dates for any of the alleged occurrences in the petition; however, the documents which the church defendants attach to their exception prove the relevant dates. Additionally, Fontaine did not object to the consideration of those documents at the trial court level and does not controvert the fact that his relationship with Cinel began in February of 1982 and terminated in late 1985 or early 1986, much more than one year prior to the date he filed his suit on November 30, 1989. Thus, under the uncontroverted evidence, the petition had in fact prescribed on its face. Even in this court, Fontaine failed to present any evidence to rebut that conclusion, but instead relies on a technical argument which he failed to make at the trial court level.
Second, the record in this case reveals that the trial court did hold a hearing on the exception, allowing the attorneys for all parties to argue their positions. Although the hearing was not transcribed and the evidence necessary to prove the exception was not formally "filed into evidence with the clerk at the time of hearing," as the dissent would require, the evidence is in the record because it was attached to the exception. That evidence is sufficient to allow the trial court to rule on the exception of prescription, and is also sufficient to allow this court to review the trial court's decision on that issue. This is especially true in light of the fact that all the crucial evidence is attached to the exception and that evidence reveals that no factual dispute exists between the parties to the action.
Third, this court has previously refused to strictly require that the trial court even hold an evidentiary hearing on an exception of prescription. See Martin, 614 So.2d 319. Given the fact that the trial court is not even required to hold a hearing of any kind under the applicable jurisprudence from this circuit, certainly the hearing allowing the parties to argue held in this case was sufficient.
Finally, under the circumstances presented by this case, where this court is convinced that the claims for sexual abuse and clergy malpractice are indeed prescribed, reversing the judgment on a procedural technicality, as advocated by the dissent, would defy judicial economy and logic. Sending the case back for the rote formal introduction of evidence which is in the record available for review would be a pointless exercise, resulting in the waste of valuable time.
For those reasons, we decline to reverse the judgment on the basis of Fontaine's procedural argument.
Since we find no merit in any of Fontaine's arguments for reversing the trial court judgment granting the exception of prescription on the sexual abuse and clergy malpractice claims, that judgment is affirmed.
2. Motion for summary judgment
When reviewing a trial court decision granting a motion for summary judgment, appellate courts consider the evidence de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. Schroeder v. Board of Supervisors, 591 So.2d 342, 345 (La.1991). That is, the appellate court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law." La.C.C.P. art. 966(B). Thus, a motion for summary judgment may be granted only when the mover has proven both of the following elements: (1) no genuine issues of material fact *555 exist, and (2) the mover is entitled to judgment as a matter of law. Chaisson v. Domingue, 372 So.2d 1225, 1227 (La.1979); Transworld Drilling v. Texas General Petroleum Co., 524 So.2d 215, 217 (La.App. 4th Cir.1988). All evidence and inferences drawn from the evidence must be construed in the light most favorable to the party opposing the motion; all allegations of the party opposing the motion must be taken as true and all doubt must be resolved in his favor. Schroeder, 591 So.2d at 345.
Fontaine makes three arguments for reversal of the trial court judgment granting the motion for summary judgment: (1) that Cinel's invasion of his privacy involved more than the simple act of distributing the pictures for publication and encompasses activities for which the church defendants could have some vicarious liability, (2) that the church "ratified" Cinel's wrongful activities, and (3) that the church defendants are independently liable for their negligent "screening, hiring, training, and supervis[ing]" of Cinel.
Since we have affirmed the trial court judgment granting the exception of prescription on the sexual abuse and clergy malpractice claims, the only issue to be considered in deciding whether the trial court properly granted the motion for summary judgment is whether any of Fontaine's arguments presents a genuine issue of material fact concerning the church defendants' possible liability for Cinel's invasion of Fontaine's privacy. The trial court decision granting the motion was obviously based on a finding that the only action taken by Cinel which invaded Fontaine's privacy was the act of distributing the photographs for publication, an activity which the trial court found completely divorced from Cinel's relationship to the church defendants. However, we find that Fontaine's first argument on this issue raises a genuine issue of material fact concerning the liability of the church defendants.
Fontaine claims that the invasion of his privacy involved more than the single act of distributing the photographs for publication, and that his privacy was invaded long before the photographs were distributed, by Cinel's actions in inducing him to pose for the photographs. Once again, Fontaine invokes a "continuing tort" principle, claiming that Cinel's distribution of the photographs was simply the last action in a series of occurrences which resulted in Fontaine's damages. Since the trial court found that the invasion of privacy claim was viable because Fontaine was unaware of his damages until less than a year before he filed suit, Cinel would be liable for all of the actions which, when cumulated together, resulted in the invasion of privacy.
When considered in the light most favorable to Fontaine, who is the party opposing the motion for summary judgment, the above allegations are sufficient to raise a genuine issue of material fact concerning the liability of the church defendants for Cinel's activities. Fontaine claims that the church defendants either knew or should have known of many of the activities performed by Cinel between February of 1982 and late 1985 or early 1986. Many of those exact activities, Fontaine alleges, ultimately resulted in damage to him because of the invasion of his privacy. Under this theory of the case, the church defendants could be liable, either vicariously or independently.
For the above stated reasons, the judgment granting the motion for summary judgment in favor of the church defendants and dismissing those defendants from the case is reversed.
Accordingly, the trial court judgment granting the exception of prescription is affirmed, and the trial court judgment granting the motion for summary judgment is reversed. The case is remanded for further proceedings.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
WALTZER, Judge, concurring in the reversal and dissenting from the affirmance.
I concur with that part of the opinion that dismisses the insurance companies. I believe the insurance companies should be dismissed on two grounds. First a number of the insurance companies did not have policies of insurance in effect covering any of the defendants at the time of the incidents complained *556 of. Their names were erroneously given to the plaintiffs as insurers by other defendants and should have been and properly were dismissed. Secondly, for those insurers who did have policies in effect at the time of the incidents complained of, we have previously held that sexual abuse is not recoverable thereunder as we have found that sexual abuse is an intentional tort. See: Doe v. Smith, 573 So.2d 238 (La.App. 1st, 1990); Menard v. Zeno, 558 So.2d 744 (La.App. 3rd, 1990); Wallace v. Cappel, 592 So.2d 418 (La. App. 1st, 1991); Shaw v. Bourn, 615 So.2d 466 (La.App. 4th, 1993); Duplantis v. State Farm General Insurance Co., 606 So.2d 51 (La.App. 3rd, 1992).
I dissent from the majority's affirmation of the exception of prescription and I concur in the majority's reversal of the grant of motion for summary judgment and remand.
The appellate record in the instant case consists of a 9 volume original, a 9 volume duplicate, 3 brown envelopes, and a blue box.
The first brown envelope contains a response to a subpoena duces tecum issued to the Louisiana Department of Public Safety consisting of Chris Fontaine's probation and parole records.
The second brown envelope contains copies of the Louisiana Department of Public Safety and Corrections records for Chris Fontaine from the Juvenile Reception and Diagnostic Center in Baker, Louisiana.
The third envelope contains a brown bound document entitled "Plaintiff's Memorandum in Opposition to Motion for Reconsideration of Exception of Prescription and 15 attachments thereto consisting of the following:
Attachment 1 Box # 1 Inventory (of pornographic materials seized from Dino Cinel's room)titles of 41 videos. Box # 2 Inventorytitles of 51 videos. Box # 3 Inventorytitles of 45 magazines. Box # 4 Inventorydescription of 113 still photograph albums, catalogs, magazines, envelopes of photographs, 4 undeveloped rolls of film and pamphlets. (The court has not had an opportunity to review any of this material, none of the actual videos, magazines, etc. have been produced in this court; only a list of titles with an interpretive description of each is on the lists was attached by plaintiffs to the back of their memo).
Attachment 2 Deposition of Dino Cinel taken Aug. 9, 1990 at offices of Darryl J. Tschirn
Attachment 3 Excerpts of unidentified testimony
Attachment 4 Transcript of Tape 3 of NOPD interrogation taken July 11, 1989 at 1:40 p.m. by Officers George Tolar, Bob Kessel, Bill Shera and Steve Menchel. (Page 3 is missing).
Attachment 5 Psychological Evaluation of Chris Fontaine by Dr. Gerald Wiener
Attachment 6 Dec. 19, 1989 Letter from Don Richard to Darryl Tschirn confirming agreement that Archdiocese agrees to pay all reasonably psychiatric, psychological, and medical treatment of Chris Fontaine in return for copies of all medical records and reports.
Attachment 7 Affidavit from Dr. Barbara Hardin, Fontaine's treating psychologist.
Attachment 8 One page from Hope Haven Termination Report.
Attachment 9 Deposition of Dr. Gerald Wiener taken July 14, 1992 at Lemle and Kelleher.
Attachment 10 Pages 43 through 49 of an unidentified deposition.
Attachment 11 Affidavit of Andrea Weaver apparently repudiating statements she may have made in a July 9, 1992 deposition at Lemle and Kellerher, which deposition is neither attached nor contained anywhere else in the record.
Attachment 12 Two pages of an unidentified deposition.
Attachment 13 June 21, 1983 letter to Dino Cinel from COQ Mail Order International in Denmark.
Attachment 14 Transcript of January 24, 1983 hearing 24th Judicial District Court before Hon. Lionel Collins.
Attachment 15 Photocopy of Tony Magazine published by COQ International Mail Order featuring various nude and seminude photographs of Chris Fontaine with stickers identifying date of photo, *557 Fontaine's age at the time, and premises at which photo taken.
Also contained in the third envelope is a document entitled "Memorandum in Opposition to Defendants' Motion to Dismiss, Alternatively, To Stay, and for Contempt" with the following attachments:
Attachment 1 June 21, 1983 Letter to Dino Cinel from COQ Mail Order International in Denmark.
Attachment 2 April 14, 1989 letter from Tom Rayer, Denechaud & Denechaud to Detective George Tolar, District Attorneys Office.
Attachment 3 Transcript of Oct. 25-26, 1991 hearings State v. Dino Cinel Docket Nos. 349-764/351-925 Section "D" Criminal District Court, Orleans Parish
Attachment 4 Box # 1 Inventory (of pornographic materials seized from Dino Cinel's room)titles of 41 videos. Box # 2 Inventorytitles of 51 videos. Box # 3 Inventorytitles of 45 magazines. Box # 4 Inventorydescriptions of 113 still photograph albums, catalogs, magazines, envelopes of photographs, 4 undeveloped rolls of film and pamphlets.
Attachment 5 Motion and Order to File Petition for Damages Under Seal.
Attachment 6 Motion and Order to Preserve Evidence.
Attachment 7 Notice of Deposition, Amended Notice of Deposition, and Subpoena Duces Tecum relative to deposition of George Tolar.
Attachment 8 March 9, 1990 Consent Judgment.
Attachment 9 March 12, 1990 Amended Consent Judgment.
Attachment 10 August 9, 1990 Deposition of Dino Cinel taken at office of Darryl Tschirn.
Attachment 11 Motion to Seal Record by Dino Cinel.
Attachment 12 July 24, 1991 deposition of Jeanne Gagliano.
Attachment 13 Vanity Fair Magazine Article entitled "Unholy Alliances" published December, 1991.
Attachment 14 Oct. 10, 1991 letter from John Bant, Researcher Vanity Fair Magazine to Darryl Tschirn.
Attachment 15 Photocopy of Associated Press Newspaper Article Dateline Albuquerque, New Mexico entitled "3 More Lawsuits Accuse Ex-Priest of Molestations" date of publication and newspaper not indicated.
Attachment 16 Photocopy of a cartoon by Don Wright of the Palm Beach Post.
The blue box contains a duplicate of the "Memorandum in Opposition to Defendants' Motion to Dismiss, Alternatively, To Stay, and for Contempt" and attachments listed above.
The record is 9 volumes. Other than pleadings, subpoenas and transmittal letters, the 9 volumes also contain the following: Vol. II Document entitled "Plaintiff's Exhibit 7" unattached to any pleading, found directly behind a subpoena to the Church requesting all records in possession of Catholic Church pertaining to Dino Cinel, to which it obviously does not belong.
Vol. III 1. Document entitled "Motion and Order for Production of Documents" contains the following attachments:
Labeled Exhibit A Copy of March 12, 1990 Consent judgment.
Labeled Exhibit B Unnamed 3 page list which contains entries looking like: "*1. Box 2, # 11" plus page 7 of the Box 2 inventory and copies of the Box 3 and Box 4 inventories described above.
Labeled Plaintiff's Exhibit 1 Copy of Psychiatric Evaluation of Chris Fontaine by Dr. Gerald Wiener
Labeled Plaintiff's Exhibit 2 Discharge Summary of Chris Fontaine by Dr. Barbara Hardin
Labeled Plaintiff's 3 Copy of JoEllen Smith Hospital Discharge Summary
Labeled Plaintiff's 4 Dec. 19, 1989 Letter from Don Richard to Darryl Tschirn confirming agreement that Archdiocese agrees to pay all reasonably psychiatric, psychological, and medical treatment of Chris Fontaine in return for copies of all medical records and reports.

*558 Labeled Plaintiff's 5 August 9, 1990 Deposition of Dino Cinel taken at office of Darryl Tschirn.
Labeled Plaintiff's 6 Hope Haven/Madonna Manor Termination Report re: Chris Fontaine
2. Document entitled "Memorandum in Opposition to Rule to Show Cause" contains the following attachments:
Labeled Exhibit 1 Copy of "Motion to Exclude Public from Hearing on Pre-Trial Motions and to Seal Evidence" filed June 13, 1991 in State v. Dino Cinel Criminal District Court # 349-746
Newspaper article entitled "College of S.I. Puts Porn Prof On Paid Leave" by Rob Polner. Newspaper and date unidentified.
New York Post Newspaper Article June 16, 1991 entitled "Ex-Priest Admits Trysts With Teen Boys in Church" by Rob Polner
Clarion Herald Newspaper Article May 23, 1991 entitled "Abp. Hannan: No `Deal' Ever Cut with Cinel" by Abp. Phillip M. Hannan
Newspaper Article entitled "Angelico No Sacred Cow" in TV Focus of Times-Picayune undated.
Newspaper Article entitled "Unholy Orders" by Jason Berry Gambit May 28, 1991
Newspaper Article entitled "The Dino Cinel Case: A Story of Credulous Priests" by James Gill Other Opinions Column Times-Picayune May 23, 1991.
Newspaper Article entitled "DA Charges Ex-Priest with Child Porn Possession" by Michael Perlstein Times-Picayune May 22, 1991
Newspaper Article entitled "No Anger Just Pity at Fallen Priests's New Orleans Church" by Frank Donze Times-Picayune May 20, 1991
Newspaper Letter to the Editor entitled "Archbishop denies `deal' offer in porn case" Letter by Archbishop Phillip M. Hannan Times-Picayune May 19, 1991
Newspaper Article entitled "Hannan denies priest's claim of sex-case deal" by Walt Philbin Times-Picayune May 19, 1991
Newspaper Article entitled "Ex-priest: Hannan made deal with him" by Michael Perlstein and Walt Philbin Times-Picayune May 17, 1991
Newspaper Article entitled "Church denies deal made in priest case" by Susan Finch Times-Picayune May 18, 1991
Newspaper Article entitled "Ex-priest says he came to N.O. with sex in mind" by Susan Finch and Michael Perlstein Times-Picayune May 16, 1991
Newspaper Article entitled "DA's ex-wife says priest visited home" by Walt Philbin Times-Picayune May 24, 1991"
Newspaper Article entitled "Cinel is expected to surrender" by Walt Philbin Times-Picayune May 23, 1991
Newspaper Article entitled "Ex-priest pleads innocent, says he's changed his life" by Walt Philbin Times-Picayune May 29, 1991
Newspaper Article entitled "Abp. Schulte: Cinel disregarded responsibilities" by Abp. Francis Schulte Clarion Herald May 23, 1991
Newspaper Article Letter to Editor entitled "Church Lawyers Respond to Cinel Story" Letter by Don M. Richard Response Column Gambit undated.
Photocopy of 13 pages of a book entitled Fair Trial & Free Press author publisher and edition unidentified.
Vol. IV Quintuplicate originals of a Document entitled "Memorandum in Support of Rule to Show Cause" containing the following attachments:
Labeled Exhibits A through H Copies of Pleadings
Labeled Exhibit I a collection of newspaper articles:
Newspaper article entitled "College of S.I. Puts Porn Prof On Paid Leave" by Rob Polner. Newspaper and date unidentified.
New York Post Newspaper Article June 16, 1991 entitled "Ex-Priest Admits Trysts With Teen Boys in Church" by Rob Polner
Clarion Herald Newspaper Article May 23, 1991 entitled "Abp. Hannan: No `Deal' Ever Cut with Cinel" by Abp. Phillip M. Hannan
*559 Newspaper Article entitled "Angelico No Sacred Cow" in TV Focus of Times-Picayune undated.
Newspaper Article entitled "Unholy Orders" by Jason Berry Gambit May 28, 1991
Newspaper Article entitled "The Dino Cinel Case: A Story of Credulous Priests" by James Gill Other Opinions Column Times-Picayune May 23, 1991.
Newspaper Article entitled "DA Charges Ex-Priest with Child Porn Possession" by Michael Perlstein Times-Picayune May 22, 1991
Newspaper Article entitled "No Anger Just Pity at Fallen Priests's New Orleans Church" by Frank Donze Times-Picayune May 20, 1991
Newspaper Letter to the Editor entitled "Archbishop denies `deal' offer in porn case" Letter by Archbishop Phillip M. Hannan Times-Picayune May 19, 1991
Newspaper Article entitled "Hannan denies priest's claim of sex-case deal" by Walt Philbin Times-Picayune May 18, 1991
Newspaper Article entitled "Ex-priest: Hannan made deal with him" by Michael Perlstein and Walt Philbin Times-Picayune May 17, 1991
Newspaper Article entitled "Church denies deal made in priest case" by Susan Finch Times-Picayune May 18, 1991
Newspaper Article entitled "Ex-priest says he came to N.O. with sex in mind" by Susan Finch and Michael Perlstein Times-Picayune May 16, 1991
Newspaper Article entitled "DA's ex-wife says priest visited home" by Walt Philbin Times-Picayune May 24, 1991"
Newspaper Article entitled "Cinel is expected to surrender" by Walt Philbin Times-Picayune May 23, 1991
Newspaper Article entitled "Ex-priest pleads innocent, says he's changed his life" by Walt Philbin Times-Picayune May 29, 1991
Newspaper Article entitled "Abp. Schulte: Cinel disregarded responsibilities" by Abp. Francis Schulte Clarion Herald May 23, 1991
Newspaper Article Letter to Editor entitled "Church Lawyers Respond to Cinel Story" Letter by Don M. Richard Response Column Gambit undated.
Vol. VI Document entitled "Memorandum in Support of Motion to Preserve Evidence" containing the following attachments:
Labeled Plaintiff's Exhibit 1-Box #1 through Box # 4 Inventories described above.
Labeled Plaintiff's Exhibit 2-"Motion and Order to Preserve Evidence"
Labeled Plaintiff's Exhibit 3-"Motion and Order to Preserve Evidence"
Labeled Plaintiff's Exhibit 4-"Order" dated Feb. 13, 1992 issued by Fourth Circuit
Labeled Plaintiff's Exhibit 5-Writ disposition dated Feb. 21, 1992 issued by Fourth Circuit
Labeled Plaintiff's Exhibit 6-"Motion and Order to Preserve Evidence" and Memo in Support thereof.
Labeled Plaintiff's Exhibit 7-"Order" dated March 26, 1992 in Cinel v. Connick, U.S.D.C., E.D.La. # 92-0721"F"(5)
Document entitled "Memorandum in Support of Motion to Determine the Applicability of the Qualified Protection for Non-Confidential News and Motion for Expedited Hearing" contains the following attachments:
Labeled Exhibit A-"Objections to Subpoenas"
Vol. VII Document "Memorandum in Support of Motion to Continue Trial Indefinitely" contains following attachments:
Labeled Exhibit A "Consent Judgment"
Labeled Exhibit B "Order"
Labeled Exhibit C Copy of Subpoena ordering C. William Bradley to appear in court.
Labeled Exhibit D Copy of Order and Reasons in Cinel v. Connick
Labeled Exhibit E Copy of Request for Production
Labeled Exhibit F Copy of Response to Request for Production

*560 Labeled Exhibit G Copy of Motion to Preserve Evidence, Rule to Show Cause and Memorandum in Support of Motion to Preserve Evidence with all of the same attachments previously noted.
Duplicate originals of Document "Memorandum in Opposition to Defendant's Motion to Continue Trial Indefinitely" with same attachments previously noted.
Document entitled "Memorandum in support of Motion to determine the Applicability of the Qualified Protection for Non-Confidential News to Jason F. Berry, Jr. and Motion for Expedited Hearing" containing the following attachments:
Labeled Exhibit A-Notice of Deposition of Jason Berry
Labeled Exhibit A(2)-Subpoena issued to Jason Berry
Labeled Exhibit B-Copy of Return on Subpoena issued to Jason Berry
Labeled Exhibit C-Objection to Subpoena
Document entitled "Memorandum In Support of Motion of Defendants for Reconsideration of Exception of Prescription" with the following attachments:
Labeled A-Judgment and Reasons for Judgment by Judge Tobias dated Nov. 13, 1990.
Labeled B-Memorandum in support of Motion to Dismiss, Alternatively to Stay, and for Contempt.
Labeled C-Memorandum in support of Defendant's Exception of Prescription
Labeled D-Complaint and Summons in Fontaine v. Church, First Judicial District Court of Harrison County, Mississippi
Labeled E-Copy of Psychological Report by Nancy Rumage dated 7/14 & 8/2/81
Labeled F-Pages 50 through 53, inclusive of an unidentified deposition.
Labeled G-Pages 41 through 43, inclusive and page 127 of an unidentified deposition.
Labeled H-Pages 68 through 71, inclusive of an unidentified deposition.
Labeled I-Pages 52 through 54, inclusive of an unidentified deposition.
Vol. IX Duplicate copies of Document entitled" Memorandum in Opposition to Motion to Defendants' Joint Motion for Summary Judgment contains the following attachments:
Labeled Plaintiff's Exhibit 1-Defendants' brief in James and Mary Doe v. Church et. al., Fourth Circuit Court of Appeal No. 91-CA-0988
Labeled Plaintiff's Exhibit 2-Fourth Circuit Opinion in James and Mary Doe v. Church et. al., Case No. 91-CA-0988 [602 So.2d 129] (June 18, 1992)
Labeled Plaintiff's Exhibit 3-April 14, 1989 letter to Sgt. George Tolar, D.A.'s office from Tom Rayner, Denechaud & Denechaud
Labeled Plaintiff's Exhibit 4-Pages 39 and 40 of Transcript of October 25-26, 1991 hearings in State v. Dino Cinel No. 349-764/351-925 Criminal District Court, Parish of Orleans
Labeled Plaintiff's Exhibit 5-Pages 53 through 55, inclusive of deposition of Dino Cinel taken August 9, 1990 at office of Darryl Tschirn.
Labeled Plaintiff's Exhibit 6-Pages 57 and 58, inclusive of deposition of Fr. James Augustine Tarantino taken August 9, 1990 at office of Darryl Tschirn.
Labeled Plaintiff's Exhibit 7-Transcript of hearing on January 24, 1983 before Hon. Lionel Collins in State v. Christopher Fontaine, No. 82-3408L 24th Judicial District Court, Jefferson Parish
Labeled Plaintiff's Exhibit 8-Motion and Order allowing filing of Cross Claim after Answer Filed and Cross Claim.
As is apparent from this review of the attachments, in fact there are only a few documents exclusive of pleadings, and those documents have been photocopied and repeatedly reattached to various pleadings a multiplicity of times. Additionally, some of the attachments are not in and of themselves competent evidence and would not be admissible in their present form. For example, there are repeated instances of only a few *561 pages of a deposition being attached to a pleading. As we all know, many a deponent's statement pulled out of context inaccurately portrays the testimony. Many a deponent's statement has been clarified upon further questioning to the extent that the meaning is almost opposite to the quote taken out of context. This court, like the trial court, deserves to be able to read an entire deposition, not selected pages. I would find the selected pages inadmissible in the absence of the entire deposition. Additionally, I would note that the depositions were discovery depositions, not depositions taken to perpetuate testimony, such that opportunities for cross were limited.
In addition to the incomplete depositions, some attachments are not admissible as evidence due to a lack for corroborating testimony. For example, one of the most telling attachments is the transcript of Tape 3 the New Orleans Police Department Interrogation taken July 11, 1989 at 1:40 p.m. by Officers Tolar, Kessel, Shera and Menchel. The transcript, however, is not attested to by the transcriber, is not sworn testimony under oath, has not been identified by corroborating testimony by one of the police officers present taking the stand at a hearing and so testifying and the accuracy of the tape and transcript have not been testified to by an officer present at the interrogation.
Newspaper articles are never admissible to prove the veracity of the statements contained therein as newspaper articles are written or codified hearsay.
Counsel for plaintiff alleges no hearing was held. Counsel for defendants allege there was a hearing. The majority depends upon the boiler plate language at the beginning of the judgment as the basis for its finding that there was a hearing. There is no transcript of a hearing in the record. If counsel for the defendants are correct and there was a hearing, this court would welcome their proving it by filing the transcript thereof into the record. Counsel for appellant is normally charged with filing the transcript of the hearing of the judgment complained of into the record, but in this instance he argues there is none. Our courts are courts of written record, not oral courts. Until a transcript is filed into the record, this writer is inclined to believe that there was no hearing when the unusual absence of a transcript is weighed against routine boilerplate language included at the top of every judgment.
An examination of the attachments related to the exception of prescription is now in order. Plaintiff argues contra non valentem, namely prescription does not begin to accrue against a plaintiff until he discovers the wrong or harm done to him. From the point of discovery, he then has within the applicable prescriptive period to file suit. In this case, plaintiff specifically argues that he believed that his relationship with Dino Cinel was a genuine love relationship and it was not until he saw photographs of himself published in a Danish magazine that he realized that the affection had been a lie used to exploit him. When he realized that the loving relationship that he thought had existed was a sham, he experienced severe depression, including suicidal tendencies. It is obvious to this writer that the contra non valentem claim can only be proven through expert psychiatric testimony.
In most contra non valentem cases, the court does not have the benefit of a transcript of the exact moment in time at which the harm or wrong is discovered by the plaintiff. This case is unusual in that we do have a transcript of the exact moment when plaintiff discovered that Cinel had sold his photos to the Danish magazine. The transcript of Tape 3 at the moment in time when the police officers put the copy of the magazine in front of Chris Fontaine provides:
(Rustling of papers, period of silence)
CF What is this?
P You tell me.
CF Don't do this to fuckin' me, please.
P It's gotta be done, bro, it's already done, it's all over.
P This is nothing that, uh ...
P Where's this at?
P Look at it and see.
CF It's saying it's in California, that's where it's at.
P That's not the only thing, the whole book. The whole book is you. Look at *562 it. That comes out of Denmark. Look through it. Look through each picture, Chris. Go through every page. (pages rustling)
This just didn't come up yesterday, Chris. This isn't something recent.
CF Tell me something, how can he do this shit?
P Well, that's what we're trying to do. How you know exactly what we're trying to do. You're the victim. You've been used. As long as you live, you're going to have that crap. (sound of sobbing)
That's the other side of these people. That's how he bought the camp. Where do you think he got all the money from, Chris, huh?
CF I want him in prison. I'll nail this mother-fucker, I swear. If ya'll don't I will, OK.
P We're going to do our job.
CF I don't know nothing about this, OK, he fucking used me. Alright. Every dog has his fucking day.
P That's it. We want to get his day coming up right now, OK. That's why we need your help. OK. You were a victim, man. We told you you were a victim. We're not, you know, this is just stuff that he's done to you OK? We have not lied to you one time. We never lied to you since you've been here. Everything we told you has been the truth. We've told you you were a victim, and we've told you we're going to treat you like a victim, and we're going to ask you to tell us the truth, I told you that's what we want.
CF That's all I've been doing is telling the truth.
P We told you that we were here to try to put the guy away. And we want to do our job. We told you that last time you were here, we told you again this time. That's what we're trying to do. That's the end result of everything, that is the result.
CF Where's ...
P This is a magazine that's sold all over the world, right? Um, hm. It comes out of Denmark. C.O.Q. is a international distributor of child pornography. The magazine that he got in the mail that you said came like this, people all over the world got that magazine. Right. This isn't the only copy. This is the monthly issue of a magazine called "Dreamboy," OK. This was your magazine. This was you. The whole magazine is you. C.O.Q. international distributor of child pornography.
CF That's in Santa Cruz.[1]
P Alright, that's what we want you to do.
CF That's on thethis is the condominium in Biloxi that we went to ...
P I want you to write on each photograph. Just take your time, look through it if you will, please.
CF My spelling ain't that good.
P Oh, no, no, no, you know how to spell Biloxi? We'll spell, you know ... Where was this picture at first? This start off with the cover. Start with the cover first. Let's take them all. Yeah, let's do them all. What about this picture here, the 4-page one. Do you know where that's at? The T-shirt, you had a black T-shirt on.
CF That's in California.
P California? In other words, you think it's the same, is that in California? Do you think it's the same as that?
CF Exactly.
P You can see the palm trees and stuff in the background.
CF That's on the Santa Cruz beach.
P Santa Cruz beach in California.
CF That's Santa Cruz, yeah. Santa Cruz on the beach.
P On the beach? And there's a few other...
CF I don't believe this shit, man.
P What'd you think he was doing?
CF (Unintelligible)

*563 P Where do you think he gets all the money to buy these houses, on State St., on Tonti, or apartment complex? Why do you think he turned that video machine on the second you walked in the door? Every time and left it on the entire time. The entire time, even when ya'll were watching TV? And eating dinner? He was waiting for a sexual encounter to take place.
CF I guess I would be wrong right now if I said that he deserves the electric chair. He deserves death.
P Well we got to do something to put him in jail. We want to get his ass into jail. (Pages 9-12).
Attachment 5 is the psychological evaluation by Dr. Gerald Wiener. Chris Fontaine was referred to Dr. Wiener by his attorney and the Archdiocese paid Dr. Wiener's fee. Dr. Wiener stated in his report:
The major reason for referral involves the patient having had an affair with a clergyman, on the lasted from age 17 to age 20. He was very much in love with this clergyman and the affair was consensual. However, he felt the clergyman had betrayed himin that pornographic pictures were taken and sold "for one million dollars." The patient, consequent to general IQ, does not seem to have number conceptand he uses terms such as "one million" and "president of the university" not as a need to exaggerate but he does not understand concepts such as "university positions", large sums of money. In any event, the patient claims that pornographic literature was taken and soldand he feels betrayed. In addition, his clergyman/lover wanted him to engage in sexual affairs with another young man for photographic purposes.
* * * * * *
By the patient's account, it is not so much that he is homosexual, heterosexual, or bisexualit is as if he has a vast degree of emptiness and lacks an identityhe will attach to any figure who will provide him with reassurance, love, comforttraits that appear to have been lacking throughout his formative years. He informed me that his former lover is now the president of Newcomb college, and I would submit that he is probably in their employin a lower level academic position. The patient does not resent seduction, he resents having been betrayed and seems to be literally crushed by the episodeboth by his wife leaving him currently as well as the pornographic picture sale and other sexual events surrounding the ex-clergyman in question."
Attachment 7 is an affidavit from Dr. Barbara Hardin, a clinical psychologist who treated Chris Fontaine as an in-patient when he was admitted to JoEllen Smith Hospital for suicidal tendencies and depression and continued to treat him after discharge on an out-patient basis:
I ... have been treating Christopher Fontaine since November, 1989, in both an outpatient therapist and inpatient therapist capacity. I have reviewed previous evaluations, materials from Hope Haven, Dr. Gerald Wiener's evaluation, as well as my own clinical impressions. It is my definite clinical opinion as an expert that Mr. Christopher Fontaine could not have possibly sought legal remediation for the incidence of sexual abuse which occurred between he and Father Dino Cinel for the following reasons:
1. Mr. Fontaine is severely dyslexic. This has been documented many times with the most recent documentation occurring in ... 1990. He consistently reads at approximately the third grade level on the various measures. This is consistent with the testing done at Hope Haven while a resident there, and is consistent with the WRAT administered by Dr. Gerald Wiener. The fourth grade reading level is considered to be a minimal "functional reading level". By this, someone with a functional reading level can read a job application, can order food at a fast food restaurant and can read a newspaper. He cannot do these things.
2. Mr. Fontaine is functioning in the borderline range of mental retardation. What this intellectual range means is that 91.3% of the population in his age group function at a higher intellectual ability than *564 what he shows. His overall intellectual functioning is at least one and-a-half standard deviations below the average period. His verbal and intellectual functions are also measured within the low average range whereas his performance-intellectual abilities are measured within the low average range. His fund of general knowledge obtained scale score of 5 which does fall within the mild range of mental retardation, as does his vocabulary and arithmetic skills. He also obtained a particularly low scale score on the picture arrangement subtest which is a sequencing task which measures the subject's ability to determine logical cause and effect relationships. This task was within the borderline range. In addition, this man has had little formal education; he was placed in special education by Jefferson Parish in the third grade and spend most of his growing up years in various institutions, particularly his five years in Hope Haven. He has never had a course in Civics, Louisiana History or American History. He has only rudimentary ideas about how the government works and about the legal system.
3. Concrete Thinking. This man's ability to abstract is very limited which means his problem solving ability is bound to experiences he has had before. He has absolutely no skills in how to obtain information. For example, in psychotherapy sessions, he has had to work on how and where to find out information about such simple matters as where to go to resolve a driver's license problem, where to advertise to sell a used car, and where one could find information about buying a used lawn mower.
4. Chris has had extremely limited support and guidance from his parents[2], who separated when he was a child. The Hope Haven records reflect he had only sporadic contact with them during his growing up years ... When Chris was institutionalized, his family rarely visited him, nor did they participate in planning for him. They did not help him establish himself when he was released ... His first wife appears also to have had a limited formal education herself, and would not have been able to advise him.
Mr. Fontaine told Mr. David Paddison during their first visit that he was there seeking help because he was in some sort of criminal trouble because of the investigation, and therefore must need a lawyer. Mr. Fontaine had no conception that investigators spoke to people who were not themselves in trouble to obtain information in such matters.
I asked him why he didn't consult an attorney at that time. He looked puzzled and replied, "What for? I wasn't in jail." I then asked him what else lawyers do besides bail people out of jail. He replied that he thought they did "business stuff" for millionaires. Until Mr. Paddison explained the possible recourse to Mr. Fontaine, he had no idea such a thing even existed. Furthermore, until he was faced with the indisputable evidence that he had been used in the form of pornographic pictures, he was not aware that what had happened between he and Father Cinel constituted harmful action.
5. Institutionalization. All of Mr. Fontaine's early and middle adolescence were spent in institutions, mainly in a Roman Catholic institution, Hope Haven. Psychological research on the effects of long-term institutionalization is very clear: residents learn to do what they are told, especially by authority figures; they learn not to question, and even residents of institutions who are of normal intellectual functioning, begin to lose their ability to make decisions for themselves and think critically. Because of this, someone who has just been released from a five year institution in a living situation is very unlikely to question authority, particularly from someone who is a legitimate authority figure.
Furthermore, Mr. Fontaine reported that he was reared as a Roman Catholic, and had described himself as religious. At the time of the incidents, he was still practicing Catholicism and had served as an altar boy while at Hope Haven. For religious reasons, he was taught to view priests as absolute authority figures, particularly *565 in moral matters and he believed it was "God's will" to do what priests told you to do. When I asked him if he ever questioned if what they were doing was wrong, he said that when Father Cinel committed sodomy on him in the St. Rita's sacristy after he had been an altar boy and Father Cinel had celebrated Mass, he did not feel that was right, and questioned it. He also stated that when Father Cinel wanted him to have a menage-a-trois with another boy or with his younger brother, he began to question whether what he was doing was right. Mr. Fontaine was aware that priests could not marry, but could not define the word chastity. This is in line with his overall vocabulary level which is within the mentally retarded range of functioning.
6. This young man has severe emotional factors and psychopathology which make him particularly vulnerable to the psychological coercion which accompanies sexual victimization. He never had a father figure, his relationship with his mother has been distant and conflictual at best, and he was reared in impersonal institutions, emerging as a very, very needy young man looking for affection and attention. Through various evaluations and through his course of psychotherapy, it is known that he has an underlying borderline personality disorder which indicates the presence of severe psychopathology. He also was diagnosed as being "hyperactive" (the present-day attention deficit disorder with hyperactivity) which limits people's ability to delay impulses and to anticipate consequences. Since he found out about the pornography pictures being published in a magazine, Mr. Fontaine has had major depression with melancholia, and has had suicidal and homicidal ideations.
It is my opinion that the patient believes that Father Cinel was very, very powerful and could harm him or even kill him. He has repeatedly stated that Father Cinel could "throw him in jail in a second", and was aware at one point that he was on probation in Jefferson Parish for offenses, and Father Cinel had been court appointed as his guardian. He also stated that Father Cinel was a very important person and knew people, and would have him killed if he tried to do anything. These feelings have continued even to the present time that he is in danger for attempting to rectify the situation.
In summary, Mr. Fontaine is a young man with severe learning disability and borderline intellectual functioning and certainly had no grasp of the American legal system. He was unable to obtain recourse or legal advice until his employer at the time of the discovery of the pictures helped him obtain an attorney. It is very doubtful with Mr. Fontaine's level of skills that he would have even been able to arrange an appointment for himself, much less consider the implications of various forms of recourse. He viewed attorneys solely through the criminal justice system as either people who sent you to jail, or bailed you out of jail. This is certainly consistent with this man's severe learning problem and borderline intellectual functioning.
The only psychiatric evidence in the record consist of the above two reports, Dr. Wiener's deposition, Dr. Hardin's Discharge Summary from JoEllen Smith and the JoEllen Smith Discharge Summary. Neither Cinel nor the Archdiocese presented psychiatric evidence refuting that of Drs. Wiener and Hardin. They did not have their own expert. The only "evidence" presented is selected pages of Dr. Wiener's deposition, which when read in toto, supports plaintiffs case. In short, there is insufficient evidence in the record to support a grant of the exception of prescription. Fontaine discovered the harm on July 11, 1989 after 1:40 p.m. and filed suit approximately 4 months later in November of the same year, 1989, his suit was timely filed and the exception of prescription was improperly granted.
I agree with the majority that there are many issues of genuine material fact presently contested such that the motion for summary judgment should be reversed under C.C.P. Art. 966(B).
NOTES
[1] The parties to this appeal have filed various motions and cross-motions to strike in this court. Those motions are granted insofar as they relate to matters not properly in the trial court record. In deciding this appeal, we have considered only the record evidence.
[1] Dino Cinel had taken Chris Fontaine with him on a number of out of town trips including 1 or more to California.
[2] Chris Fontaine's parents abandoned him when he was in second grade.